**LONG ISLAND LIGHTING COMPANY, Plaintiff,**

v.

**Mario M. CUOMO, in his official capacity as Governor of the State of New York, Paul L. Gioia, in his official capacity as Chairman of the New York Public Service Commission, Harold A. Jerry, Jr., Anne F. Mead, Gail Garfield Schwartz and John Doe, in their official capacities as Commissioners of the New York Public Service Commission, the Long Island Power Authority, and William L. Mack, Irving Like, Nora Bredes, Leon Campo, Richard Kessel, Stephen Liss, Vincent Tese, John Adam Kanas, and Martha Bernstein, in their official capacities as Trustees of the Long Island Power Authority, Defendants,**

**and**

**Shoreham-Wading River Central School District, and the Assessor and the Board of Assessment for the Town of Brookhaven, Intervenor-Defendants.**

**No. 87–CV–39.**

United States District Court, N.D. New York.

Aug. 4, 1987.

Shea & Gould, Hunton & Williams, New York City, Anthony F. Earley, Hicksville, N.Y., Shea & Gould, Albany, N.Y., for plaintiff; Michael Lesch, Kurt Hunciker, John G. Nicolich, Barry V. Sautman, Dennis Sisk, Edward M. Barrett, George V. Cook, Adeeb Fadil, New York City, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for defendant Cuomo; Peter Bienstock, Mary M. Gundrum, Alfred L. Nardelli, Samuel A. Cherniak, Asst. Attys. Gen., of counsel.

Fabian Palomino, New York City, Special Counsel to the Governor.

Kirkpatrick & Lockhart, Pittsburgh, Pa., Kirkpatrick & Lockhart, Washington, D.C., for defendants Long Island Power Authority and Individual Trustees; David A. Brownlee, Kenneth M. Argentieri, Pittsburgh, Pa., Herbert H. Brown, Lawrence C. Lanpher, Washington, D.C., of counsel.

Rutnik & Rutnik, Albany, N.Y., Local Counsel, for defendants Long Island Power Authority and Individual Trustees; Douglas P. Rutnik, of counsel.

Robert Simpson, Albany, N.Y., Acting Counsel, for Dept. of Public Service and Individual Com'n Members; David E. Blabey, James W. Brew, Lawrence G. Malone, Jonathan D. Feinberg, Marilyn M. Faulkner, of counsel.

Lou Lewis, P.C., Poughkeepsie, N.Y., for intervenor-defendant School Dist.; Lou Lewis, J. Scott Greer, of counsel.

Allen I. Sak, Brookhaven Town Atty., Medford, N.Y., for intervenor-defendant Bd. of Assessment; Francis J. Gluchowski, Asst. Town Atty., of counsel.

MUNSON, Chief Judge.

## MEMORANDUM–DECISION AND ORDER

This action is the latest in a series of legal conflicts centering around the Shoreham Nuclear Power Station ("Shoreham"), an unlicensed nuclear reactor located on the north shore of Long Island in the Town of Shoreham, New York. *See, e.g., Long Island Lighting Co. v. County of Suffolk*, 628 F.Supp. 654 (E.D.N.Y.1986); *Citizens for an Orderly Energy Policy, Inc. v. County of Suffolk*, 604 F.Supp. 1084 (E.D. N.Y.1985), *aff'd*, 813 F.2d 570 (2d Cir.1987); *Long Island Lighting Co. v. County of Suffolk*, 604 F.Supp. 759 (E.D.N.Y.1985); *Cuomo v. Nuclear Regulatory Comm'n*, 772 F.2d 972 (D.C.Cir.1985); *County of Suffolk v. Long Island Lighting Co.*, 589 F.Supp. 1387 (E.D.N.Y.1984); *see also Kessell v. Public Service Comm'n*, 123 A.D.2d 203, 511 N.Y.S.2d 441 (3d Dept.1987).

In the present case, plaintiff Long Island Lighting Company ("LILCO" or "the utility"), a New York corporation engaged in the production and sale of electricity and the sole owner of the Shoreham plant, raises a number of facial constitutional challenges to two recent enactments passed by the New York legislature which the utility claims are designed to allow a newly-created public power authority to bypass New York State's eminent domain procedures and will result in the public takeover of LILCO without providing its shareholders fair and just compensation. The Used and Useful Act, Chapter 518 of the laws of 1986 (McKinney's Session Laws), amended § 66 of the Public Service Law and provides that if Shoreham is not in commercial operation at least by January 3, 1989,[1] LILCO cannot recover construction costs for the nuclear reactor through the rates it

---

1. The terms of the Used and Useful Act do not become effective until Shoreham is abandoned,

charges its customers. *See* N.Y.Pub. Serv.Law § 66(24) (McKinney Supp.1987). The Long Island Power Authority Act ("LIPA Act"), chapter 517 of the laws of 1986 (McKinney's Session Laws), establishes the Long Island Power Authority ("LIPA" or "the authority") and authorizes this newly-created public entity to acquire LILCO through a negotiated buy-out, hostile tender offer, or the exercise of eminent domain powers. *See* N.Y.Pub.Auth.Law § 1020 *et seq.* (McKinney Supp.1987). Before the court are motions by the various defendants to dismiss the complaint or for summary judgment and cross-motions by LILCO for partial summary judgment and a preliminary injunction preventing any actions by state officials pursuant to the LIPA Act.

## I. BACKGROUND

### A. *The History of the Shoreham Nuclear Reactor*

LILCO is the sole owner of the Shoreham Nuclear Power. Station, an 809 mega-

watt (MW) nuclear-powered electricity generating facility located on the north shore of Long Island in the County of Suffolk. As a utility possessing a natural monopoly over its service area, LILCO is subject to extensive regulation by the New York State Public Service Commission ("PSC") with respect to the rates it may charge its customers, the issuance and sale of its securities, and most details concerning its day-to-day and long-term operation. *See generally* N.Y.Pub.Serv.Law § 64 *et seq.* (McKinney 1955 & Supp.1987). Specifically, § 69 of the Public Service Law imposes on the PSC considerable responsibility in overseeing and approving an electric utility's issuance of "stocks, bonds, notes or other evidences of indebtedness" to finance "the construction, completion, extension or improvement of its plant or distributing system, or for the improvement or maintenance of its service...." [2] N.Y.Pub. Serv.Law § 69 (McKinney Supp.1987). With regard to the construction and opera-

LILCO is denied a full-power operating license for the plant, forty-two months pass from the time LILCO obtained a low-power testing license for the plant, or some other event renders Shoreham "not commercially used and useful in *the actual generation of electricity.*" N.Y.Pub. Serv.Law § 66(24) (McKinney Supp.1987). LILCO obtained a low-power testing permit for Shoreham in June 1985. By January 3, 1989, forty-two months will have elapsed. This appears to be the latest date upon which the Used and Useful Act could go into effect.

**2.** Section 69 provides in pertinent part:

A gas corporation or electric corporation organized or existing ... under or by virtue of the laws of the state of New York, may issue stocks, bonds, notes or other evidences of indebtedness payable at periods of more than twelve months after the date thereof, ... when necessary for the acquisition of property, ... for the construction, completion, extension or improvement of its plant or distributing system, or for the improvement or maintenance of its service or for the discharge or lawful refunding of its obligations or for the reimbursement of moneys actually expended from income or from any other moneys in the treasury of the corporation not secured or obtained from the issue of stocks, bonds, notes or other evidences of indebtedness of such corporation, within five years next prior to the filing of an application with the commission for the required authorization, for any of the aforesaid purposes except

maintenance of service and except replacements in cases where the applicant shall have kept its accounts and vouchers of such expenditure in such manner as to enable the commission to ascertain the amounts of moneys so expended and *the purposes for which* such expenditure was made; provided and not otherwise that there shall have been secured from the commission an order authorizing such issue, and the amount thereof, and stating the purposes to which the issue or proceeds thereof are to be applied, and that, in the opinion of the commission, the money, property or labor to be procured or paid for by the issue of such stocks, bonds, notes or other evidences of indebtedness is or has been reasonably required for the purposes specified in the order, and that except as otherwise permitted in the order in the case of bonds, notes and other evidences of indebtedness, such purposes are not in whole or in part reasonably chargeable to operating expenses or to income.... For the purpose of enabling it to determine whether it should issue such an order, the commission shall make such inquiry or investigation, hold such hearings and examine such witnesses, books, papers, documents or contracts as it may deem of importance in enabling it to reach a determination. Such corporation shall not without the consent of the commission apply said issue or any proceeds thereof to any purpose not specified in such order. Such gas corporation or electric corporation may issue notes,

tion of nuclear power plants, LILCO is subject to extensive regulations promulgated by the United States Nuclear Regulatory Commission ("NRC") pursuant to the Atomic Energy Act. 42 U.S.C. §§ 2011–2282; 10 C.F.R. Part 50 (1987). To build and operate a nuclear power generating plant in the United States, a utility must first obtain a construction permit from the NRC and, after construction has been completed, must apply for an operating license and satisfy all NRC licensing requirements. *See* 42 U.S.C. §§ 2035, 2131; 10 C.F.R. §§ 50.10, 50.33, 50.47. The standards for obtaining these permits have become increasingly stringent over the years since the Shoreham project began.

Following the enactment of the Atomic Energy Act of 1954, LILCO gave serious consideration to the feasibility of nuclear reactor power generating facilities as an alternative to "traditional" fossil-fuel electricity generating plants. Case 27563, *Long Island Lighting Co.—Shoreham Prudence Investigation,* App. A at 1 (Opinion No. 85–23, Dec. 16, 1985) (hereinafter *PSC Prudence Report*) (*see* Doc. 18, Tab 10). In the 1960s, a marked escalation in the demand for electric energy in LILCO's service area reinforced the utility's movement toward nuclear energy sources. Between 1963 and 1973, LILCO's summer peak hour demand for electric energy increased from 1,099 MW to 2,620 MW, or 138 percent. Affidavit of Adam M. Madsen, Doc. 53, Exh. 2. In 1973, LILCO forecasted a continued increase in peak demand for its service area of 6.5 percent per year. *Id.* at ¶ 4. Yet, in 1971, LILCO operated electricity generating facilities with a total capacity of only 2,874 MW. Doc. 39, ¶ 1.

In 1965, LILCO took its first steps toward the construction of a nuclear power plant to service Long Island. In April of that year, the utility's Board of Directors informed LILCO's shareholders that the construction of a 500 MW nuclear reactor was being considered. Two months later, the Stone & Webster Engineering Corporation ("Stone & Webster") became the fledgling project's architect engineer. In July 1965 LILCO's Board of Directors approved the construction of a 540 MW nuclear reactor. The reactor was expected to commence commercial operation in 1973 and to cost $124 million to build. On March 30, 1966 LILCO's Board approved the purchase of the Shoreham site, and in May 1968 LILCO submitted a Preliminary Safety Analysis Report and an application for a construction permit to the Atomic Energy Commission, the predecessor to the NRC. *PSC Prudence Report,* App. A at 1.

In November 1968 LILCO notified the Atomic Energy Commission that it intended to construct a larger facility than originally contemplated at the Shoreham site. In March 1969 the LILCO Board authorized the construction of an 820 MW boiling water nuclear reactor. This larger plant was expected to cost $217 million and was slated to begin commercial operation in May 1975. Site clearing and grading began in July 1968; a revised cost estimate of $261 million was issued in September 1969. In 1970, the Advisory Committee on Reactor Safety and the Atomic Energy Commission issued favorable reports on the Shoreham project; that same year LILCO modified its contract with Stone & Webster to reflect that a larger plant than had been initially anticipated was to be constructed. The revised total cost estimate for the construction of the reactor rose to $300 million. *PSC Prudence Report,* App. A at 1–2.

In September 1970, hearings before the Atomic Safety and Licensing Board ("ASLB") of the Atomic Engergy Commis-

for proper corporate purposes and not in violation of any provision of this or of any other act, payable at periods of not more than twelve months without such consent; but no such notes shall, in whole or in part, directly or indirectly be refunded by any issue of stock or bonds or by any evidences of indebtedness running for more than twelve months without the consent of the commission. The

commission shall have power to require every such corporation to file with the commission after the issuance of stocks, bonds, notes or other evidences of indebtedness issued with or without the approval of the commission as herein provided, a notice of such transaction in such form as the commission may prescribe.

N.Y.Pub.Serv.Law § 69 (McKinney Supp.1987).

sion began. The Commission's issuance of construction permits was abruptly halted a short time thereafter, however, in the wake of a decision by the Court of Appeals for the District of Columbia Circuit holding that the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.*, required the Atomic Energy Commission to perform a comprehensive environmental impact analysis before issuing construction permits. *See Calvert Cliffs Coordinating Committee v. Atomic Energy Comm'n,* 449 F.2d 1109 (D.C.Cir.1971). In July 1971, the Commission ceased issuing construction permits pending its development of procedures designed to comply with the *Calvert Cliffs* holding. In August, LILCO instructed Stone & Webster to curtail its engineering and procurement work, and the Shoreham project was effectively shut down. In May 1972 a new project schedule was submitted by Stone & Webster and the Shoreham project was restarted; nonetheless, it was not until September 1972 that project engineering was fully reactivated and pre-permit work was begun. In December 1972 the estimated construction cost for Shoreham was $351.4 million, and the anticipated start-up date was July 1977. *PSC Prudence Report,* App. A at 2-3.

On April 12, 1973 the Atomic Energy Commission issued a construction permit for the Shoreham project. Affidavit of Edward M. Barrett, Doc. 9, ¶ 6. Within a month of receiving that permit, LILCO's cost estimate jumped dramatically to $506 million. Then, in 1974, LILCO began to encounter numerous construction problems. There were delays in the installation of piping and pipe fabrication, delays in equipment deliveries, and delays in the deliveries of hangers and valves. Union members refused to work in double shifts, as had been contemplated by Stone & Webster's construction schedule. Further, many laborers working on the Shoreham project lacked the skills required to perform their assigned tasks, and unanticipated delays and expenditures were incurred in the time required to train those laborers. In July 1974, the cost of constructing Shoreham was estimated as $695 million, and the anticipated date for commencing commercial operation was extended from July 1977 to May 1978. *PSC Prudence Report,* App. A at 3-4.

Despite the problems that had dogged the Shoreham project through 1974, the PSC concluded in an opinion and order dated April 17, 1975 that there was "no basis" for deferring the construction of the project. Case 26721, *Long Island Lighting Co.—Construction and Maintenance Practices,* (Opinion No. 75-7, April 17, 1975) (*see* Doc. 18, Tab 2). The PSC found that Shoreham was needed if LILCO was to meet its 1978 reserve requirements and that if Shoreham were not in service in 1979, LILCO would fall short of its "capacity objective." The PSC concluded that "[a]s long as Shoreham is needed to meet LILCO's 1978 through 1980 loads, the cost of its delay would outweigh any projected benefits therefrom," and that in view of "the uncertainty of load forecasting and LILCO's relatively weak interconnections with neighboring utilities, purposeful delay of the completion of Shoreham beyond the summer of 1978 would not be prudent." *Id.* at 464. In prophetic tones, the Commission did note that "so much money has been expended on, or committed to, Shoreham that it has, in fact, acquired a momentum of its own." *Id.*

In September 1975 LILCO submitted its Final Safety Analysis Report and environmental report for NRC review; in January 1976 LILCO filed its application for an operating license. Yet delays and cost overruns continued to plague the project. In June 1976 the target date for beginning commercial operation was extended to May 1979, and the estimated construction cost of Shoreham rose to $969 million. In March 1977, Stone & Webster informed LILCO that the plant's fuel load would be delayed by fifteen to twenty-eight months. LILCO was advised by a management consulting firm that the Shoreham project was being hindered by the fact that neither LILCO nor Stone & Webster had sufficient authority or clearly defined roles in overseeing the plant's construction. In August 1977, LILCO assumed the lead role in managing Shoreham's construction. In Octo-

ber, the estimated construction cost of Shoreham was revised to $1.233 billion and the date upon which the reactor was expected to commence commercial operation was pushed back to September 1980. In October 1978, the estimated cost of Shoreham was at $1.337 billion. *PSC Prudence Report,* App. A at 4–5.

On May 21, 1979 the PSC commenced a proceeding to investigate the management of the Shoreham project in order to determine whether the costs of Shoreham had been prudently incurred, whether the steep escalation of the projected costs of Shoreham was attributable to factors within the control of LILCO's management or due to outside forces such as inflation, and whether the incurred cost of Shoreham exceeded that which would be considered reasonable and prudent due to mismanagement or gross inefficiency on the part of LILCO. *PSC Prudence Report,* at 2. The Shoreham project had come under PSC scrutiny before this investigation began; through 1978, the project had been audited by the PSC four times. *See* Case 27136, *Long Island Lighting Co.—Electric Rates,* 18 N.Y. P.S.C. 45, 45 (Opinion No. 78–1, January 9, 1978) (*see* Doc. 18, Tab 3). The investigation commenced in 1979 would result in extensive findings six years later that were critical of LILCO's management of the Shoreham project. As the investigation proceeded, Shoreham's cost overruns and delays continued. In July 1979, Shoreham's total cost was projected to be $1.58 billion and its anticipated start-up date was extended to May 1981; a year later, the projected cost rose to $2.21 billion and the date for commencing commercial operation was pushed back to November 1982; in July 1981, the estimated construction cost was at $2.49 billion. Affidavit of Kevin Bronner, Doc. 36, ¶ 6.

In March 1979, radioactive material escaped during an accident at the Three Mile Island nuclear reactor near Harrisburg, Pennsylvania. In the wake of this incident, the NRC suspended all licensing activity and subsequently adopted more rigorous emergency planning requirements for applicants seeking an operating license. *See* 45 Fed.Reg. 55,402 (1980). A detailed off-site emergency response plan, which provides reasonable assurance that the public health and safety will be protected in the event of a serious radiological accident and meets with the approval of the NRC, is now a prerequisite for a full power operating license. *See generally* 10 C.F.R. § 50.47 and Part 50, App. E (1987). The plan must set out "protective actions" for the area encompassed within a fifty-mile radius around the nuclear power plant, and an evacuation plan for citizens who are within a ten mile radius of the plant at the time of an accident must be developed. The NRC regulations contemplate that local and state governments may sponsor and implement offsite plans, 10 C.F.R. § 50.33(g), but federal law does not require state and local governments to develop, participate, or cooperate in the implementation of any such plans. *See Long Island Lighting Co.* (Shoreham Nuclear Power Station, Unit 1) LBP–85–31, 22 N.R.C. 410, 427 (August 26, 1985) (*see* Doc. 19, Tab 12). At first, officials of Suffolk County indicated a willingness to cooperate with LILCO in the implementation of an acceptable emergency response plan. *See, e.g.,* "Memorandum of Understanding Between Suffolk County, New York and Long Island Lighting Co. on Emergency Planning," December 28, 1979 (*see* Doc. 19, Tab 8). The sentiment among state and county officials favoring accomodation turned out to be short-lived.

The Three Mile Island accident did more than merely spur changes in the regulatory framework governing nuclear power facilities; it eroded public confidence in the safety of nuclear power plants in general and raised doubts in the minds of many public officials about the wisdom of the Shoreham project in particular. In February 1983, officials of Suffolk County withdrew an emergency response plan which the County had previously endorsed, determining that the demographic conditions of the area surrounding Shoreham made it impossible to fashion a feasible evacuation plan in the event of a radiological accident. *PSC Prudence Report,* App. A at 5–6. On February 17, 1983, New York Governor Mario

Cuomo directed New York's Disaster Preparedness Commission ("DPC") to refrain from acting on any emergency response plan submitted by LILCO that did not win the support of Suffolk County officials. Doc. 19, Tab 11. Neither the State nor the County of Suffolk has cooperated in the implementation of an evacuation plan since that date, and they have in fact actively opposed the licensing of Shoreham for the past four years in proceedings before the ASLB and NRC, as well as in state and federal courtrooms.

On May 26, 1983, LILCO proposed an offsite emergency response plan in which company employees were to assume the duties traditionally performed by local police and fire departments during an evacuation of the area surrounding Shoreham. This plan was actively opposed by state and county officials. In February 1985, New York Supreme Court Justice William R. Geiler held that LILCO could not implement its plan because it provided for the unlawful usurpation of the police powers of the state by private actors. *Cuomo v. Long Island Lighting Co.*, No. 84–4615 (N.Y.Sup.Ct. Feb. 20, 1985), *aff'd*, 127 A.D.2d 626, 511 N.Y.S.2d 867 (2d Dept. 1987). In April 1985 and again in August 1985, the ASLB denied Shoreham an operating license because LILCO lacked the legal authority to implement its emergency plan and because opposition by the state and Suffolk County created uncertainty as to whether the plan was workable. *See Long Island Lighting Co.* (Shoreham Nuclear Power Station, Unit 1) LBP–85–31, 22 NRC 410 (August 26, 1985) (*see* Doc. 19, Tab 12). The ASLB found that there was nothing about the demography, topography, available access routes, or jurisdictional boundaries of the area surrounding Shoreham that made it impossible to fashion an effective emergency response plan for Shoreham, but found that the lack of cooperation from the state and county was fatal to LILCO's plan. *Id.* at 427. This determination was subsequently reversed by the NRC and LILCO's application was remanded to the ASLB for a determination of whether LILCO's plan would be adequate if, irrespective of the current opposition to it, the county would use LILCO's plan in the event of an actual emergency as the best source of information and options for its emergency response. *Long Island Lighting Co.* (Shoreham Nuclear Power Station, Unit 1) CLI–86–13 (July 24, 1986). A final decision on LILCO's application has not yet been issued by the ASLB.

Opposition by state and local officials to the licensing of Shoreham was not the only problem encountered by LILCO in the first half of this decade. In May 1982, the NRC began hearings on LILCO's application for an operating license. In June 1983, LILCO filed a motion with the NRC for a low-power nuclear testing license. While this motion was pending, an undersized crankshaft on one of Shoreham's three emergency diesel generators failed. All operative nuclear reactors must have a reliable onsite source of power in the event of an emergency under the NRC's regulations. *See NRC Prudence Report*, at 92. Shoreham diesel generators did not obtain the NRC's approval as a back-up power source until June 1985. The direct costs of repair for the diesel generators and the indirect costs attributable to delays caused by the generators' failure has been estimated to be $494 million. *PSC Prudence Report*, at 92, 120.

The delays caused by design defects such as that evident in Shoreham's back-up power system, unanticipated regulatory changes by the NRC, and the opposition by state and local governmental officials to the operation of Shoreham have contributed to the continued escalation in cost of the ill-fated project through this decade. The sting of the massive cost overruns was exacerbated by the growing realization that the construction of nuclear power plants may not have been essential to meeting the future energy needs for LILCO's customers after all. Reduced energy demand and conservation efforts followed the two Middle East oil embargoes of the 1970s, and as a result LILCO's projected increases in peak demand for electricity in its service area never came about. Affidavit of Adam M. Madsen, Doc. 53, ¶ 6.

Construction work on Shoreham was substantially completed in 1984. In No-

vember of that year, the NRC issued a license allowing LILCO to load nuclear fuel into Shoreham and to operate the plant at .001% of its rated power. On February 12, 1985, the NRC authorized low-power testing of the Shoreham reactor (up to five percent of Shoreham's rated power), but rescinded that decision nine days later because of the problems with the plant's back-up power generators. *PSC Prudence Report*, App. A at 6. In June 1985, after LILCO's diesel generators were determined to satisfy the NRC's requirements, a low-powered testing license was again granted. The NRC's decision to grant this license was unsuccessfully challenged by state and local officials. *Cuomo v. Nuclear Regulatory Comm'n*, 772 F.2d 972 (D.C.Cir.1985). LILCO's inability to obtain the ASLB's approval for its offsite emergency response plan is now the only obstacle impeding the issuance of a full-power operating license for Shoreham.

On December 16, 1985, the PSC issued an opinion and order in which the Commission found that $1.395 billion of the then-estimated $4.62 billion total cost of Shoreham had been imprudently incurred and could not be recovered through rates charged to LILCO's customers. *PSC Prudence Report*, at 129. The PSC cited poor planning, LILCO's inadequate oversight of Stone & Webster and other major contractors who were working under open-ended cost-plus agreements, poor communication between LILCO's Board of Directors and Stone & Webster, inadequate supervision of skilled laborers, unrealistic schedules, and "imprudent management of the regulatory process" as major contributors to the massive cost overruns that have characterized the Shoreham project. However, the PSC also noted that delays in the completion of Shoreham and consequent escalation of costs were also attributable in part to Shoreham's "unusual regulatory environment." *Id.* at 87.

There is no question that the regulatory requirements applied to Shoreham were quite stringent and that intervention made the Shoreham licensing proceedings extraordinarily complex and lengthy. The Shoreham construction permit proceeding lasted three years and was the longest such proceeding in the NRC's history. It was 22 months longer than the average proceeding for contemporaneous nuclear plants. Because of this experience, NRC officials expected a similar, intense level of intervention in the operating license proceeding. There is also evidence that they required Shoreham to comply with the most stringent interpretations of the regulatory guides and standards so that Shoreham would have the strongest possible technical case in the operating license proceeding. As a former NRC official testified:

> ... The use of Regulatory Guides in the Shoreham proceeding demonstrates the way the Shoreham OL [operating license] review was conducted that was different from other OL reviews in the same time frames. Regulatory Guides are not requirements, as I have indicated, but deviations from them need to be justified extensively. How extensively depends on staff attitudes. In Shoreham's case it was thought to be desirable to build the strongest technical record that would show equivalent conformance to this guidance. Shoreham was always held to a higher standard and this frequently resulted in delays that did not impact other plants.
>
> The reason for this situation was straightforward. The legal staff, based on the CP [construction permit] experience, wanted the strongest technical case possible for the Shoreham OL hearing. This naturally effected [sic] the depth of review to which the application was subjected....

Finally, the length of the proceeding exposed the Shoreham plant to the plethora of regulatory changes that were issued by the NRC in the late 1970's and early 1980's.

The intense level of intervention can also be seen in the voluminous discovery and lengthy hearings in Shoreham's operating license proceeding. This proceeding, which has yet to be completed, was made even more complex when Suf-

382

folk County, which initially cooperated with LILCO on emergency planning matters, withdrew its cooperation and actively opposed any license for Shoreham.

As the Atomic Safety and Licensing Board noted in October 1984, Shoreham's licensing hearings proceeded with

[t]he unremitting and often bitter opposition of Suffolk County as an intervenor [which] has resulted in litigation of very extensive scope and depth. It is beside the point to argue that such litigation is permitted under NRC regulations. Although not illegal, such interminable litigation has resulted in great expense to LILCO, both in terms of time and resources.

In fact, LILCO is currently unable to obtain a full power operating license for Shoreham due to the lack of a tested emergency plan for the plant.

*Id.* at 85–86 (citations omitted).

The total cost of the Shoreham project as of December 31, 1986 was $4.766 billion, and this cost increases by $25–35 million in carrying charges and overhead expenses for each month the plant is not in operation. Affidavit of Edward M. Barrett, Doc. 9, ¶ 3. For several years, LILCO has teetered on the brink of insolvency. In 1986, the state's opposition to Shoreham took a new form. On July 24, Governor Cuomo signed into law two bills that LILCO argues will either push the company over the edge and into bankruptcy or, alternatively, will allow the state to seize control of the company without giving its shareholders just compensation in return. These two laws, which together constitute an unusual exercise of the state's police power, are challenged on a number of constitutional grounds.

B. *Chapters 517 and 518 of the Laws of 1986*

Concern that the ever-escalating cost of Shoreham would pose an unacceptable financial burden on ratepayers within LILCO's service area, particularly in light of the real possibility that the facility would never be put to commercial use and recoup part or all of the multi-billion dollar

investment put into it, moved the New York Assembly and Senate to pass similar bills in February 1986 that would prevent LILCO from passing the costs of Shoreham on to its customers if the reactor did not become commercially operative. On February 24, 1986, the Assembly passed a bill that would have amended § 66 of the New York Public Service Law to prohibit the PSC from allowing the recovery through the rates it sets of "any costs incurred by a utility corporation relating to a nuclear power plant if such plant fails to commence operation." Assembly Bill No. 6891 (introduced March 25, 1986) (*see* Doc. 17, Tab 1). One day later, the State Senate passed a similar bill, differing from the Assembly's bill only in that the Senate's version applied to nuclear power plants "owned by a single electric or gas and electric corporation." Senate Bill No. 6411A (introduced June 6, 1985) (see Doc. 17, Tab 3). These two bills had the same objective: to require the PSC to apply the traditional "used and useful" rate-setting method to deny certain utilities recovery of the direct and indirect costs associated with the construction of nuclear power plants that are not "used and useful in the public service." Cf. *Smyth v. Ames*, 169 U.S. 466, 547, 18 S.Ct. 418, 434, 42 L.Ed. 819 (1898) ("What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that *no more be exacted from it for the use* of [such a facility] than the services rendered by it are reasonably worth."). In recent years, the PSC has generally adhered to a policy allowing utilities to recover through rates charged its customers costs "prudently incurred" as a result of construction work on facilities which never commence commercial operation or are abandoned before their costs have been fully recovered, *see Abrams v. Public Service Comm'n*, 67 N.Y.2d 205, 214–15, 501 N.Y.S.2d 777, 781, 492 N.E.2d 1193, 1197 (1986), though the Commission has employed the "used and useful" approach in calculating a utility's rate base on occasion. *See, e.g., Matter of Rochester Gas and Electric Corp. v. Public Service Comm'n*,

85 A.D.2d 486, 449 N.Y.S.2d 77 (3d Dept. 1982).

While these bills were pending in the New York legislature a seven-member panel appointed by Governor Cuomo in January 1986 was studying the feasibility of replacing LILCO with a publicly-owned utility. On June 24, 1986, the Long Island Public Power Panel, headed by New York University President John C. Sawhill, issued a report indicating that the replacement of LILCO with a Long Island Power Authority ("LIPA") could result in significant ratepayer savings. The Panel considered three methods for effectuating the takeover of LILCO: Negotiation with LILCO's Board of Directors, a hostile tender offer for LILCO's stock, and the condemnation of LILCO's stock or assets under New York's Eminent Domain Procedure Law. The Panel concluded that a negotiated agreement was the best option, since the public takeover of LILCO could be accomplished most quickly and with the least litigation through that method. Report of the Long Island Public Power Panel (hereinafter "Sawhill Report") at 28 (June 24, 1986) (*see* Doc. 17, Tab 21). Condemnation was deemed the least attractive option.

> Control of the acquisition price, a key criterion, cannot be satisfied under condemnation. New York courts would have the discretion to apply a wide range of valuation theories to determine "just compensation." Estimates of a possible award for a LILCO asset condemnation are as high as $16 billion, applying a "reproduction cost less depreciation" theory of value. Estimates for a stock asset condemnation are as low as $1.2 billion, applying a market-value theory.... [T]he court's discretion in determining just compensation cannot be restricted by legislation, and it is highly uncertain what weight would be given to legislative directives concerning valuation. Unless waivers were secured, stock condemnation would trigger default provisions in LILCO's Third Mortgage and [1984 Revolving Credit Agreement], thus increasing the funding requirements for a stock condemnation....

> [A] hostile tender offer is preferred to condemnation because it provides LIPA with direct control over the price it will offer....

> A tender offer is legally feasible and could be facilitated if LIPA were provided with an exemption from New York State law that restricts unfriendly tender offers.... [T]he availability of the tender offer strategy strengthens LIPA's ability to negotiate with LILCO toward a mutually acceptable agreement....

> [One] reference point for shareholders [in determining how to respond to a tender offer] may be book value. For electric utilities, book value is usually an appropriate measure of the underlying value of stock since the regulators will usually grant rate increases that will provide a return on that value commensurate with the firm's cost of equity. For LILCO, if there were no dispute over Shoreham or NMP 2 [Nine Mile Point II] costs, this value could be in excess of $25 per share. However, substantial imprudence disallowances have been made on Shoreham (and are on appeal) and have been agreed to for NMP 2. These disallowances lower LILCO's adjusted book to the $17-to-$19-per share range as of year-end 1986.

> If abandoned utility plants continue to realize the same cost recovery as plants that operate, LILCO's adjusted book value could be essentially unaffected by whether Shoreham operates or not. However, if ratemaking policy changed, such that if Shoreham did not operate LILCO ... could not recover in rates any of Shoreham's cost, adjusted book value could fall substantially below the $17-to-$19-per-share range. In the case where Shoreham costs are not recovered if the unit were abandoned, LILCO's book value would fall to zero since the cost of the plant significantly exceeds LILCO's book value of equity. In any event, if shareholders believe that there is a reasonable probability that Shoreham will not operate and that stringent used and useful legislation will be enacted, the current market value will probably decline and a

tender would be be [sic] more likely to succeed at lower prices than without such legislation.

*Id.* at 28–34 (footnote omitted).

On June 16, 1986, Governor Cuomo submitted to the legislature a "program bill" that would require the PSC to apply the used and useful method of determining an electric company's rate base when costs associated with nuclear power plants that fail to commence or continue in commercial operation are incurred by the utility. Doc. 17, Tab 6. The proposed bill, which by its terms was applicable to all utilities operating or constructing nuclear reactors in the State of New York, precluded the PSC from considering costs associated with reactors that fail to "commence or continue commercial operation" when computing a utility's revenue requirement after the proposed act's effective date.[3] "Failure to commence or continue commercial operation" was defined as either the abandonment of the plant, the denial of a full-power operating license, the failure of the plant to become operative within two years of the issuance of a low-power testing license, or the occurrence of events or circumstances which render the nuclear power plant not commercially used and useful after commercial operation had begun.

On June 26, 1986, Governor Cuomo submitted a second program bill. This bill differed from that submitted ten days earlier in that its terms were made applicable only to nuclear reactors "owned by a single utility" and "not commercially used and useful on the effective date" of the proposed act. Doc. 17, Tab 8. These changes effectively excluded from coverage of the act all existing nuclear power plants in the state other than Shoreham.[4] The language

**3.** If enacted, Governor Cuomo's proposed bill would have amended § 66 of the Public Service Law to include the following subsection:

(a) If a nuclear power plant fails to commence or continue commercial operation after the effective date of this subdivision, the commission shall thereafter remove and exclude from the utility corporation's revenue requirement all amounts, costs, charges, adjustments, or extraordinary cost of capital allowances theretofore made, granted or provided which are attributable, directly or indirectly, to such nuclear power plant or to such plant's failure to commence commercial operation.

(b) The commission shall not thereafter, unless and until such plant commences or recommences commercial operation, include in such utility's revenue requirement any amounts, costs, charges, adjustments or extraordinary cost of capital allowances attributable, directly or indirectly, to such plant or to such plant's failure to commence commercial operation.

(c) Nothing in this subdivision shall be deemed to require a refund of the charges paid by or billed to a customer of such utility prior to a failure to commence or continue commercial operation of such plant.

(d) For the purposes of this subdivision, the failure to commence or continue commercial operation shall mean the abandonment of such plant after the effective date of this subdivision; the denial, including any denial pursuant to or as a result of any administrative or judicial review, of a commercial operating license or other regulatory approval necessary for the plant to become commercially used and useful in the actual generation of electric-

ity; the failure of the plant to become commercially used and useful in the actual generation of electricity within two years of the issuance of a low-power testing license for such plant; or the occurrence of any event or the existence of any circumstances (other than customary inspection and maintenance and related repairs or refueling requirements) after the plant becomes commercially used and useful in the actual generation of electricity which renders the plant not commercially used and useful in the actual generation of electricity.

Doc. 17, Tab 6.

**4.** Of the seven nuclear power plants that have completed construction in New York, only Shoreham satisfies the three criteria set out in the Used and Useful Act. The Nine Mile Point II nuclear power plant was not "commercially used and useful" on the effective date of the Act, but it is jointly owned by five utilities (the Niagara Mohawk Power Corporation, LILCO, the New York State Electric and Gas Corporation, the Rochester Gas and Electric Corporation, and the Central Hudson Gas and Electric Corporation). Three other nuclear power plants located in the State of New York are owned by a single utility (Niagara Mohawk owns and operates Nine Mile Point I, Consolidated Edison owns and operates Indian Point II, and Rochester Gas and Electric owns and operates the Ginna Plant), but all three of these plants were in operation on the effective date of the Used and Useful Act and are thus not covered by its provisions. Two other plants located in New York are not owned by a "utility" but instead by the New York State Power Authority. Affidavit of Edward M. Barrett, Doc. 9.

of the Governor's second program bill was substantially adopted and enacted as Chapter 518 of the laws of 1986 ("Used and Useful Act"). The Act provides:

(a) If a nuclear power plant which is not commercially used and useful in the actual generation of electricity on the effective date of this subdivision and which is owned by a single utility on or after the effective date of this subdivision fails to commence or continue commercial operation after the effective date of this subdivision, the commission shall thereafter remove and exclude from the utility corporation's revenue requirement all amounts, costs, charges, adjustments, or extraordinary cost of capital allowances theretofore made, granted or provided which are attributable, directly or indirectly, to such nuclear power plant or to such plant's failure to commence commercial operation.

(b) The commission shall not thereafter, unless and until such plant commences or recommences commercial operation, include in such utility's revenue requirement any amounts, costs, charges, adjustments or extraordinary cost of capital allowances attributable, directly or indirectly, to such plant or to such plant's failure to commence commercial operation.

(c) Nothing in this subdivision shall be deemed to require a refund of the charges paid by or billed to a customer of such utility prior to a failure to commence or continue commercial operation of such plant.

(d) For the purposes of this subdivision, the failure to commence or continue commercial operation shall mean the abandonment of such plant after the effective date of this subdivision; the denial, including any denial pursuant to or as a result of any administrative or judicial review, of a commercial operating license or other regulatory approval necessary for the plant to become commercially used and useful in the actual generation of electricity; the failure of the plant to become commercially used and useful in the actual generation of electricity within forty-two months of the issuance of the low power testing license for such plant; or the occurrence of any event or the existence of any circumstances (other than customary inspection and maintenance and related repairs or refueling requirements) after the plant becomes commercially used and useful in the actual generation of electricity which renders the plant not commercially used and useful in the actual generation of electricity.

N.Y.Pub.Serv.Law § 66(24) (McKinney Supp.1987). Thus, Shoreham's costs will be excluded from LILCO's rate base if the plant is not in operation by January 3, 1989 (forty-two months after LILCO obtained a low power testing license from the NRC), and the Act conceivably could go into effect earlier than that.

The Used and Useful Act was signed into law on July 24, 1986, the same day Governor Cuomo approved the Long Island Power Authority Act.[5] The LIPA Act estab-

5. The provisions of the LIPA Act relevant to LILCO's constitutional claims are as follows:

§ 1020–a. *Declaration of legislative findings and declarations*

The legislature hereby finds and declares that:

Constantly escalating and excessive costs of electricity in the counties of Suffolk and Nassau and that portion of the county of Queens served by the Long Island lighting company (hereinafter referred to as the "service area") pose a serious threat to the economic well-being, health and safety of the residents of and the commerce and industry in the service area.

There is a lack of confidence that the needs of the residents and of commerce and industry in the service area for electricity can be supplied in a reliable, efficient and economic manner by the Long Island lighting company (hereinafter referred to as "LILCO").

Such excessive costs and lack of confidence have deterred commerce and industry from locating in the service area and have caused existing commerce and industry to consider seriously moving out of the service area.

The decisions by LILCO to commence construction of the Shoreham nuclear power plant and thereafter to continue such construction were imprudent.

The investment of LILCO in the Shoreham nuclear power plant has created significant rate increases, straining the economic capabilities of ratepayers in the service area, and likely will require further substantial rate increases if such plant is placed in service.

It is uncertain whether the Shoreham nuclear plant ever will go into commercial service, or if it does whether its reliability, cost of construction, operation and maintenance will be such as to provide sufficient, reliable and economic electric service to ratepayers in the service area. The very substantial financial strain of the investment in the Shoreham nuclear plant has required LILCO to suspend dividends on its common and preferred stock, severely threatening the continued economic viability of LILCO.

For all the above reasons, a situation threatening the economy, health and safety exists in the service area.

Dealing with such a situation in an effective manner, assuring the provision of an adequate supply of electricity in a reliable, efficient and economic manner, and retaining existing commerce and industry in and attracting new commerce and industry to the service area, in which a substantial portion of the state's population resides and which encompasses a substantial portion of the state's commerce and industry, are hereby expressly determined to be matters of state concern within the meaning of paragraph three of subdivision (a) of section three of article nine of the state constitution.

Such matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority. Such an authority can best accomplish the purposes and objectives of this title by implementing, if it then appears appropriate, the results of negotiations between the state and LILCO. In such circumstances, such an authority will provide safe and adequate service at rates which will be lower than the rates which would otherwise result and will facilitate the shifting of investment into more beneficial energy demand/energy supply management alternatives, realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area. Moreover, in such circumstances the replacement of such investor owned utilities by such an authority will result in an improved system and reduction of future costs and a safer, more efficient, reliable and economical supply of electric energy. The legislature further finds that such an authority shall utilize to the fullest extent practicable, all economical means of conservation, and technologies that rely on renewable energy resources, cogeneration and improvements in energy efficiency which will benefit the interests of the ratepayers of the service area.

. . . . .

§ 1020–c. *Long Island power authority; creation*

1. For the purpose of effectuating the policy declared in section one thousand twenty-a of this title, there is hereby created a corporate municipal instrumentality of the state to be known as the "Long Island power authori-ty", which shall be a body corporate and politic and a political subdivision of the state, exercising essential governmental and public powers.

2. The area of operations of the authority shall be the service area.

3. The authority is not created or organized, and its operations shall not be conducted, for the purpose of making a profit. No part of the revenues or assets of the authority shall inure to the benefit of or be distributable to its trustees or officers or any other private persons, except as herein provides for actual services rendered.

. . . . .

§ 1020–h. *Acquisition of property, including the exercise of the power of eminent domain*

1. The legislature hereby expressly finds and determines:

(a) The acquisition by the authority, through purchase or the exercise of the power of eminent domain, of either the securities or assets of LILCO whichever is less expensive for the ratepayers, as the authority may determine will be just to the ratepayers in the service area, is the most appropriate means of dealing with the emergency involving the economy, health and safety of the residents and the industry and commerce in the service area, notwithstanding the fact that LILCO presently may be devoted to a public use, since the public use of such property by the authority is hereby deemed to be superior to the public use of such property by any other person, association, or corporation.

(b) The authority, prior to exercising its power of eminent domain to acquire the stock or assets of LILCO, shall enter into negotiations with LILCO for the purpose of acquiring such stock or assets upon such terms as the authority, in its sole discretion, determines will result in rates equal to or less than the rates which would result if LILCO were to continue in operation.

(c) The situs of all stock issued by LILCO, a New York corporation, is the state of New York.

(d) The compensation paid by the authority to LILCO shall be just to the ratepayers in the service area who must pay such compensation.

(e) If the authority determines that it is the stock of LILCO that should be taken, the proper measure of damages shall be the fair market value thereof as evidenced by the price of such stock on the exchange on which they are traded on the valuation date since there is an established market for such stock that is reflective of its value. In no event, however, shall consequential or severance damages be awarded if control of LILCO shall have been taken by the authority.

(f) If the Authority determines that it is the assets of LILCO that should be taken, fair market value would not constitute just compensation to LILCO since there is an insufficient market in the usual sense for its assets

to ascertain the value thereof from the market. In determining the compensation payable for such assets, there shall be taken into consideration the capitalization of LILCO's expected furture earnings.

(g) LILCO has no reasonable expectation of realizing actual earnings from the Shoreham plant or giving effect to any earnings or returns which may have been reflected on the books of LILCO for accounting purposes. Moreover, it would not be reasonable, under current and reasonably foreseeable circumstances, to expect that the Shoreham plant would be reproduced by a public or private utility in LILCO's present position.

(h) LILCO would have to phase in over a long period of time any rate increases based on the costs of the Shoreham plant.

(i) The public service commission has imposed a limitation on the earnings which LILCO may realize on its interest in the Nine Mile Point [II] nuclear power facility.

(j) The public service commission has imposed on LILCO imprudence penalties with respect to the Shoreham plant.

(k) In determining just compensation, the following factors shall be evaluated in deciding whether OCLD [original cost of assets, less depreciation] or RCNLD [reproduction cost of new assets, less depreciation] or neither constitutes the proper basis:

(i) LILCO is a regulated utility. Under the laws of the state providing for the regulation of utilities, LILCO's future earnings are restricted to the permitted rate of return times LILCO's OCLD.

(ii) LILCO presently is being operated as an enterprise the economic viability of which is dependent upon extraordinary financial stability adjustments by the public service commission. Such extraordinary and unprecedented rate relief was granted by the public service commission in order to provide cash flow relief to prevent LILCO's bankruptcy with the expectation that ratepayers would receive the full credit of such in lower rates, and that the public service commission required such extraordinary rate relief to be discontinued in the event that LILCO filed a petition for relief in a voluntary case under the Bankruptcy Act or if a final order for relief was entered involuntarily under such act. LILCO's lack of profitability results not from any repressive or other improper action taken by any governmental entity but from such factors as mismanagement, imprudent decisions regarding the Shoreham plant and general inefficiency.

(iii) There is no reasonable probability that, after condemnation of its assets, LILCO will reproduce them.

(iv) Use of RCNLD may result in an unwarranted windfall to LILCO and an unjustifiable penalty to the ratepayers who would have to pay it, since to the extent an award based on RCNLD would exceed an award based on OCLD, it would reflect to a large extent the effects of inflation which would not increase the value of the property to LILCO or its rate base for ratemaking purposed or to the authority for the purpose of continuing to generate and transmit electric power within the service area.

· · · · ·

2. In furtherance of the legislative findings and determinations set forth in subdivision one of this section, the authority is hereby authorized and empowered to acquire, through purchase or the exercise of the power of eminent domain, all or any part of the securities or assets of LILCO, as the authority in its sole discretion may determine; provided, however, that prior to proceeding with any such acquisition under this title, the board shall determine, in its sole discretion based upon such engineering, financial and legal data, studies and opinions as it may deem appropriate, that the rates projected to be charged after such acquisition and for such reasonable period of time as the board may determine will not be higher than the rates projected to be charged by LILCO during such period if such acquisition had not occurred.

3. The authority also is authorized and empowered, in its discretion, to make a tender offer or tender offers for all or any portion of the securities of LILCO at such price or prices as the authority may determine to be appropriate; provided, however that such tender offer or tender offers, in the sole judgment of the authority, will result in rates less than the rates which would result from continued operation by LILCO.

(a) The authority shall make such offer or offers or any adjustment thereof prior to acquiring any such securities or any assets of LILCO through the exercise of the power of eminent domain. The authority may pay for such securities in cash or by exchanging therefor the authority's bonds or a combination thereof.

(b) In the case of a tender offer in which a subsidiary of the authority acquires at least sixty-six and two-thirds percent of LILCO's common stock, such subsidiary may merge with LILCO and either continue in existence or dissolve, as it may determine.

(c) The provisions of section five hundred thirteen and article sixteen of the business corporation law and any other provisions of law relating to procedures in a corporate takeover, including without limitation chapter nine hundred fifteen of the laws of nineteen hundred eighty-five, shall not be applicable to the actions of the authority pursuant to this title.

(d) In determining whether acceptance of such a tender offer by the authority is in the best interests of LILCO, the directors of LILCO shall consider not only the dollar amount of such offer but the interests of employees, suppliers, ratepayers, creditors (including holders of LILCO's debt securities), and the economy of the service area and the state.

lished the Long Island Power Authority, provided for its organization, and outlined its general powers. N.Y.Pub.Auth.Law §§ 1020 et seq. (McKinney Supp.1987). The newly-created authority is a political subdivision of the state to be operated on a non-profit basis, N.Y.Pub.Auth.Law § 1020–c(1) and (3), and, with some exceptions not material to this lawsuit, is exempted from coverage by the Public Service Law. N.Y.Pub.Auth.Law § 1020–s. LIPA is empowered to form wholly-owned subsidiaries and may exercise all or part of its powers through such subsidiaries. N.Y. Pub.Auth.Law § 1020–i. LIPA is to serve the area now constituting LILCO's franchise area. N.Y.Pub.Auth.Law §§ 1020–c(2), 1020–b(17). The authority is empowered to acquire the securities or assets of LILCO either through a negotiated agreement, a tender offer, or the exercise of the power of eminent domain. N.Y.Pub. Auth.Law § 1020–h.

Under the LIPA Act, the authority may not attempt to acquire the stock or assets of LILCO until it makes a determination that the acquisition would result in savings for ratepayers in LILCO's franchise area. N.Y.Pub.Auth.Law § 1020–h(2) and (3). Once that determination has been made,

9. As soon as practicable after the authority has acquired sufficient shares of LILCO stock to do so or after it has acquired all the property of LILCO pursuant to this title, the authority shall forthwith close and decommission the Shoreham plant and shall investigate and develop alternative uses, if any, for such plant.

§ 1020–p. *Exemption from taxation*

2. The authority shall be required to pay no taxes nor assessments upon any of the property acquired or controlled by it or upon its activities in the operation and maintenance thereof or upon income derived therefrom, provided that nothing herein shall prevent the authority from entering into agreements to make payments in lieu of taxes with the governing bodies of municipalities, as provided for in sectin one thousand twenty-q of this title.

§ 1020–q. *Payments in lieu of taxes*

1. Each year after property theretofore owned by LILCO is acquired by the authority by any means authorized by this title and, as a consequence, is removed from the tax rolls, the authority shall make payments in lieu of taxes to municipalities and school districts equal to the taxes and assessments which would have been received from year to year by each such jurisdiction if such acquisition had not occurred, except for such taxing jurisdictions which tax the Shoreham plant, in which case the in lieu of tax payments shall in the first year after the acquisition be equal to one hundred percent of the taxes and assessments which would have been received by such taxing jurisdictions. In each succeeding year such in lieu of tax payments shall be decreased by ten percent until such time as such payments equal taxes and assessments which would have been levied on such plant in a nonoperative state.

3. No municipality or governmental subdivision, including a school district or special district, shall be liable to the authority or any other entity for a refund of property taxes originally assessed against the Shoreham plant. Any judicial determination that the Shoreham plant assessment was excessive, unequal or unlawful for any of the years from nineteen hundred seventy-six to the effective date of this title shall not result in a refund by any taxing jurisdiction of taxes previously paid by LILCO pursuant to such Shoreham plant assessment. The authority shall discontinue and abandon all proceedings, brought by its predecessor in interest, which seek the repayment of all or part of the taxes assessed against the Shoreham plant.

§ 1020–t. *Authority not to construct or operate a nuclear powered facility in the service area*

In no event shall the authority construct or operate a nuclear powered facility in the service area.

§ 1020–gg. *Severability*

The provisions of this title are severable, and if any part or provision hereof, or the application thereof to any person or circumstance, shall be adjudged by any court of competent jurisdiction to be invalid or unenforceable, such judgment shall not affect, impair or invalidate the remainder of this title or the application of such provision to any other person or circumstance, but shall be confined in its operation to the provision, person or circumstance directly involved in the controversy in which such judgment shall have been rendered.

N.Y.Pub.Auth.Law § 1020 et seq. (McKinney Supp.1987). The LIPA Act is designated as Title 1–A of the Public Authorities Law. New York's Public Authorities Law contains two titles designated as Title 1–A, which use parallel section numbering. Obviously, all references in this

LIPA must attempt to acquire LILCO through negotiation or a tender offer for all or a portion of LILCO's securities "at a price ... the authority may determine to be appropriate" before resorting to condemnation proceedings. N.Y.Pub.Auth.Law § 1020–h(3)(a). LIPA may attempt to purchase LILCO's securities with either cash or bonds issued pursuant to § 1020–k of the Act. N.Y.Pub.Auth.Law § 1020–h(3)(a). LIPA is specifically exempted from New York's anti-takeover laws,[6] and the LIPA Act overrides provisions in New York's Business Corporation Law ("BCL") which would otherwise allow LILCO's Board of Directors or a majority of LILCO's preferred shareholders to veto any proposed merger.[7] N.Y.Pub.Auth.Law § 1020–h(3)(b) and (c). In determining whether acceptance of a tender offer is in the best interests of LILCO, the Act directs LILCO's Board to "consider not only the dollar amount of such offer but the interests of employees, suppliers, ratepayers, creditors (including holders of LILCO's debt securities), and the economy of the service area and the state." N.Y.Pub. Auth.Law § 1020–h(3)(d). If a subsidiary of LIPA acquires two-thirds of LILCO's common stock the subsidiary "may merge with LILCO and either continue in existence or dissolve, as it may determine." N.Y.Pub.Auth.Law § 1020–h(3)(b).

If LIPA fails to acquire LILCO via a tender offer, it is empowered to exercise the power of eminent domain to acquire LILCO's stock or assets. Under the LIPA Act, if LIPA condemns LILCO's property, valuation must be determined by "giving due consideration to the applicable findings and determinations of the legislature" set

---

Memorandum-Decision and Order refer to the Long Island Power Authority Act.

**6.** Section 1020–h(3)(c) of the Public Authorities Law specifically provides that LIPA is not subject to the terms of chapter 915 of the laws of 1985 (McKinney's Session Laws), codified as § 912 of the Business Corporation Law. Section 912 provides in part:

Notwithstanding anything to the contrary contained in this chapter (except the provisions of paragraph (d) of this section), no resident domestic corporation shall engage in any business combination with any interested shareholder of such resident domestic corporation for a period of five years following such interested shareholder's stock acquisition date unless such business combination or the purchase of stock made by such interested shareholder on such interested shareholder's stock acquisition date is approved by the board of directors of such resident domestic corporation prior to such interested shareholder's stock acquisition date. If a good faith proposal is made in writing to the board of directors of such resident domestic corporation regarding a business combination, the board of directors shall respond, in writing, within thirty days or such shorter period, if any, as may be required by the Exchange Act, setting forth its reasons for its decision regarding such proposal. If a good faith proposal to purchase stock is made in writing to the board of directors of such resident domestic corporation, the board of directors, unless it responds affirmatively in writing within thirty days or such shorter period, if any, as may be required by the Exchange Act, shall be deemed to have disapproved such stock purchase.

N.Y.Bus.Corp.Law § 912(b) (McKinney 1986).

**7.** Under Article 9 of the Business Corporation Law, any plan of merger or consolidation must be voted upon by the shareholders of each of the merging corporations:

The plan of merger or consolidation shall be adopted at a meeting of shareholders by vote of the holders of two-thirds of all outstanding shares entitled to vote thereon. Notwithstanding any provision in the certificate of incorporation, the holders of shares of a class or series shall be entitled to vote and to vote as a class if the plan of merger or consolidation contains any provision which, if contained in an amendment to the certificate of incorporation, would entitle the holders of shares of such class or series to vote and to vote as a class thereon. In such case, in addition to the authorization of the merger or consolidation by vote of the holders of two-thirds of all outstanding shares entitled to vote thereon, the merger or consolidation shall be authorized by vote of the holders of a majority of all outstanding shares of each such class or series.

N.Y.Bus.Corp.Law § 903(a)(2) (McKinney 1986). An exception to this general rule is made in cases where a parent corporation owning ninety percent or more of a subsidiary's stock wishes to merge with the subsidiary. In such cases, it is unnecessary to obtain the authorization of shareholders before consummating the merger. N.Y.Bus.Corp.Law § 905(a) (McKinney 1986). The LIPA Act bypasses the terms of these provisions of the Business Corporation Law, allowing a subsidiary of LIPA to merge with LILCO upon obtaining two-thirds of LILCO's common stock. The approval of the holders of any of LILCO's preferred classes of stock is not required before completing the merger. N.Y.Pub.Auth.Law § 1020–h(3)(b).

out in § 1020–h(1). N.Y.Pub.Auth.Law § 1020–h(6)(e). The legislature specifically found that LILCO had "no reasonable expectation of realizing actual earnings" from Shoreham; that LILCO's present economic viability depends upon "extraordinary and unprecedented" rate adjustments by the PSC, and the LILCO's financial problems were the result of its own "mismanagement, imprudent decisions regarding the Shoreham plant and general inefficiency" rather than "any repressive or other improper action taken by any governmental entity." *See* N.Y.Pub.Auth.Law § 1020–h(1) (g)–(n).

The Act requires LIPA to close and decommission the Shoreham plant "[a]s soon as practicable after the authority has acquired sufficient shares of LILCO stock to do so or after it has acquired all the property of LILCO" pursuant to the Act. N.Y.Pub.Auth.Law § 1020–h(9). Further, LIPA is prohibited from constructing or operating a nuclear power plant in its service area. N.Y.Pub. Auth.Law § 1020–t. LIPA is exempted from taxation, and the Act provides that payments are to be made to the taxing jurisdictions affected by the closure of Shoreham in gradually decreasing increments over a ten-year period in order to ameliorate the effects of the sudden loss of a major source of revenue for those taxing jurisdictions. N.Y.Pub.Auth.Law §§ 1020–p, 1020–q. The Act also provides that the taxing jurisdictions are not to be liable "to the authority or any other entity" for the refund of any property taxes previously assessed against Shoreham. N.Y.Pub.Auth.Law § 1020–q(3).

On January 14, 1987 LILCO commenced this action pursuant to 42 U.S.C. § 1983, raising a number of constitutional challenges to the Used and Useful Act and the LIPA Act. In Counts I–IV of its Complaint, LILCO claims that the Used and Useful Act violates the due process and equal protection clauses of the fourteenth amendment, the fifth amendment's takings clause, and the prohibition against bills of attainder found in article I, section 10 of the Constitution. Challenges to the LIPA Act are made under these same constitu-

tional provisions in Counts V–VIII. In Count IX, LILCO alleges that defendant Cuomo conspired with officials of the State of New York and the County of Suffolk to close the Shoreham plant in violation of § 1983. LILCO seeks a declaration that the Used and Useful Act and the LIPA Act, or specifically designated sections of the LIPA Act, violate the Constitution, an injunction preventing the Commissioners of the Public Service Commission ("PSC defendants") from implementing the Used and Useful Act, an injunction preventing LIPA and its individual trustees ("LIPA defendants") from making a tender offer for LILCO's stock or otherwise implementing or enforcing the LIPA Act, an injunction preventing defendant Cuomo and other specified members of the Executive Branch from "taking any actions or issuing any reports or findings … contrary to law or contrary to their own discretion and better judgment with respect to the Shoreham Plant," and an order granting attorney fees and costs incurred as a result of this action. The various defendants move to dismiss the Complaint or, in the alternative, for summary judgment. LILCO moves for summary judgment on its equal protection, bill of attainder, and unlawful takings claims respecting the Used and Useful Act, and for a preliminary injunction preventing a tender offer under the LIPA Act.

## II. DISCUSSION

### A. *Ripeness*

As a preliminary matter, the court must determine whether LILCO's claims present a justiciable case or controversy properly subject to judicial resolution. The legal concept of justiciability blends the constitutional limitations placed upon the federal courts by Article III with prudential considerations cautioning the exercise of judicial restraint. *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). This fusion of constitutional prohibitions and policy considerations has made the justiciability doctrine "one of uncertain and shifting contours," *id.,* without "fixed content" nor "susceptible of scientific verification." *Poe v. Ullman,* 367 U.S. 497, 508,

81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961). The fine line separating an abstract question from a "case or controversy" is often difficult to define, and the justiciability of a claim "is not discernible by any precise test." *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). In an oft-quoted passage, Chief Justice Hughes defined a justiciable controversy as

> one that is appropriate for judicial determination. . . . A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. . . . The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). In sum, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" to justify judicial resolution. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

Various doctrines have evolved as conceptual aids in defining the unsettled borders separating the hypothetical from the concrete, each addressing the different aspects of justiciability revealed in the above-quoted passage from *Maryland Casualty. See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3529 (2d ed. 1984). Among them is the ripeness doctrine, which is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" over governmental policies that have not yet been implemented nor have had a palpable impact upon the parties before the court. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *see also Thomas v. Union Carbide Agricultural Products Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 3333, 87 L.Ed.2d 409 (1985); *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm'n,* 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).

"[R]ipeness is peculiarly a question of timing," *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974), that must be assessed within the context of the legal and factual posture of the parties' claims at the time a judicial pronouncement is sought. *See* Nichol, *Ripeness and the Constitution,* 54 U.Chi.L.Rev. 153, 167 (1984). Determining whether a claim is ripe for review is particularly difficult in cases, like this one, where a party seeks a declaration concerning the constitutionality of a recently-enacted statute when implementation of the terms of that statute is contingent on some future event.[8] In the present dispute, the various defendants urge that LILCO's claims are not ripe for adjudication. Under the terms of the LIPA Act, LIPA cannot acquire LILCO until it has determined that public takeover of the utility would result in ratepayer savings. N.Y. Pub.Auth.Law § 1020–h(2). Further, the specific provisions of the LIPA Act which have been attacked by LILCO will not have force and effect until LIPA's trustees have

---

**8.** *Compare Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595 (1978) (Merits of constitutional challenge to Price-Anderson Act 42 U.S.C. § 2210, which imposed limitation on liability for nuclear accidents resulting from operation of federally licensed private nuclear power plants, addressed by Supreme Court even though no nuclear accident had occurred at the time case was decided and "such an occurrence would eliminate much of the existing scientific uncertainty surrounding this subject") with *Pacific Gas & Electric,* 461 U.S. at 203, 103 S.Ct. at 1721 (When it was uncertain whether California State Energy Resources Conservation and Development Commission would ever find a nuclear power plant's interim storage capacity for spent fuel to be inadequate, and when there was no likelihood that industry behavior would be "uniquely affected" by uncertainty surrounding state statute governing interim storage, challenge to statute deemed premature).

made such a determination. *See, e.g.,* N.Y. Pub.Auth.Law §§ 1020–h(2)–(6), (9). Similarly, the Used and Useful Act may never directly affect the rates charged by LILCO, since the utility may obtain a full-power operating license for Shoreham before some event occurs which would require the PSC to remove and exclude the cost of the plant from LILCO's revenue requirement. N.Y.Pub.Serv.Law § 66(24). To date, the LIPA trustees have not determined whether acquisition of LILCO would likely result in savings for consumers in LILCO's franchise area, nor has an event triggering the terms of the Used and Useful Act occurred.

■ Whether a dispute is ripe for decision turns on a twofold inquiry into the "fitness" of the issues presented for a judicial disposition on the merits and the hardship to the parties that would result if court review was withheld. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The first factor addresses essentially prudential concerns regarding the propriety of judicial intervention before a fuller factual record has been developed. The second factor focuses on the "hardships" on the parties, an inquiry inescapably intertwined with the concept of a "distinct and palpable injury," the essence of the case or controversy requirement of Article III. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The court will address the second factor of the *Abbott Laboratories* formula first.

### 1. Hardships Imposed by Withholding Decision on Merits

■ When a declaration is sought concerning the legal consequences of events that may or may not occur, the determination of whether postponing decision might work unacceptable hardships on the litigants often turns on the "practical likelihood that the contingency will occur," *see Browning-Ferris Industries of Alabama, Inc. v. Alabama Department of Environmental Management,* 799 F.2d 1473, 1478 (11th Cir.1986) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2757 (2d ed. 1983)), and the

severity of the harm that would result if the contingency does occur. *See, e.g., Toilet Goods Ass'n, Inc. v. Gardner,* 387 U.S. 158, 164–65, 87 S.Ct. 1520, 1524–25, 18 L.Ed.2d 697 (1967) (distinguishing between cases in which serious consequences result from delaying decision and cases in which harm caused by delay is minor); *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974) ("[I]t is not necessary that [plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statutue that he claims deters the exercise of his constitutional rights."). In short, the party challenging a statute must demonstrate a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," *Babbitt v. Farm Workers,* 442 U.S. at 298, 99 S.Ct. at 2308, but need not "await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough." *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923); *see also Babbitt v. Farm Workers,* 442 U.S. at 298, 99 S.Ct. at 2308; *Regional Rail Reorganization Act Cases,* 419 U.S. at 143, 95 S.Ct. at 358.

Turning first to the hardship imposed on LILCO by withholding consideration of its claims challenging the LIPA Act, the court finds that this factor militates in favor of the exercise of the court's jurisdiction. The LIPA Act constitutes an imminent threat to the continued corporate existence of LILCO itself, since a tender offer could be made immediately upon a determination by LIPA's trustees that a public takeover of LILCO would be beneficial to the utility's ratepayers. Though certainly not of the magnitude of the possible criminal prosecution of an individual for the exercise of his speech rights, *see Steffel,* 415 U.S. 452, 94 S.Ct. 1209, the potential harm that would be suffered by LILCO should LIPA find acquisition of LILCO advantageous for consumers is nonetheless severe, particularly if the utility's constitutional objections to the statutory scheme devised to implement LIPA's takeover of LILCO are meritorious. Further, the extensive record that has already accumulated in this case

strongly indicates that LIPA will find that ratepayer savings will result from the acquisition of LILCO. First, it appears that LILCO's rates are currently among the most exorbitant in the nation. *See Sawhill Report,* Exh. 2. Further, an exhaustive study by the Long Island Power Panel indicates that significant savings—ranging from seven to nine percent—would result from LIPA's acquisition of LILCO under any set of plausible assumptions, though ratepayer savings would be greater under some scenarios than they would under others. *Id.* at 1–44. For example, if it were assumed that LILCO would successfully operate Shoreham while LIPA would abandon the plant, ratepayer savings of seven percent were projected. *Id.* at 14–15. Though these findings are in no way binding on LIPA, which must make an independent assessment of the benefits of public takeover of LILCO, the court finds that the conclusions of the Long Island Power Panel is some evidence relevant to the likelihood that LIPA will conclude that such a takeover would be advantageous. Finally, the court cannot simply ignore altogether political reality. The LIPA Act was specifically designed to facilitate the takeover of LILCO. In *Entertainment Concepts, Inc., III v. Maciejewski,* 631 F.2d 497 (7th Cir.1980), *cert. denied,* 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981), the Seventh Circuit found that the owner of an adult theater could challenge zoning and licensing ordinances specifically aimed at the theater itself, even though no film it had exhibited had been declared obscene, thus invoking the ordinances' penalties, and even though there was no assurance that any film the theater exhibited in the future would be declared obscene. The court concluded that the circumstances under which the ordinances were passed "indicate[d] more than a broad policy that [the Village] will enforce the laws generally" and that the plaintiff "need not risk closure of its theatre in order to activate judicial review." *Id.* at 500. Similarly, the factual backdrop for the passage of the LIPA Act detailed above and the fact that the Act was enacted for the specific purpose of providing a means for the public takeover

LILCO is relevant to assessing the "practical likelihood" that LIPA's trustees will find acquisition of LILCO beneficial to area ratepayers and that LILCO will suffer direct harm as a result.

The court also finds that withholding consideration of LILCO's challenge to the Used and Useful Act would work a palpable hardship on the utility, even though the statute may never in fact directly affect the determination of LILCO's revenue requirement. First, there is evidence that the Act, when coupled with LILCO's well-known difficulties in obtaining a full-power operating license for Shoreham from the NRC, has created concern over whether LILCO will ever recoup a significant part of its Shoreham investment, and this concern has depressed the value of LILCO's stock, Affidavit of Kenneth S. Crews, Doc. 12, ¶¶ 9–12, and has hindered LILCO's efforts to refinance the redemption of certain outstanding bonds and other debts. Affidavit of Herbert M. Leiman, Doc. 11. Further, the immediate hardship felt as a result of the Used and Useful Act must be assessed with reference to the terms of the LIPA Act. Informed holders of LILCO securities, when assessing how to respond to any tender offer made by LIPA, no doubt would be influenced by the fact that if LILCO fails to obtain a full-power operating license from the NRC the value of LILCO's stock would in all probability plummet, and indeed the utility could be forced into bankruptcy. It is not unreasonable to conclude, then, that this threat might induce LILCO's shareholders to sell at a lower price than they might otherwise be inclined when and if LIPA makes its initial tender offer. If the Used and Useful Act is unconstitutional, withholding decision could result in serious harm to LILCO's shareholders.

### 2. *Fitness of Issues Raised for Judicial Resolution*

The court's inquiry does not end upon finding that withholding consideration of LILCO's claims would impose palpable hardships on LILCO and its shareholders. In determining whether the first prong of

the *Abbott Laboratories* formula has been satisfied and the issues presented are "fit" for decision, the court necessarily must look to the substance of LILCO's claims themselves. For example, the ripeness doctrine rarely has stood as an impediment to a litigant challenging laws regulating speech. The first amendment mandates that an individual's speech rights are not unnecessarily "chilled," and the mere existence of a statute can have such a chilling effect even though no steps have been taken toward enforcing the statute. *See, e.g., Steffel,* 415 U.S. at 459, 94 S.Ct. at 1215; *Times Film Corp. v. Chicago,* 365 U.S. 43, 45–46, 81 S.Ct. 391, 392–93, 5 L.Ed.2d 403 (1961). At the other end of the spectrum, claims under the takings clause of the fifth amendment usually require a more developed factual background before judicial intervention is appropriate. *See, e.g., Williamson Co. Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,* 452 U.S. 264, 295, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981). In assessing the fitness of a particular claim for judicial resolution, the courts have as a general rule focused on whether further factual development would clarify the issues presented. *See, e.g., Thomas,* 473 U.S. at 581, 105 S.Ct. at 3333; *Pacific Gas & Electric,* 461 U.S. at 201, 103 S.Ct. at 1720; *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 162–64, 87 S.Ct. 1520, 1523–24, 18 L.Ed.2d 697 (1967). Thus, facial attacks on statutes or regulations ordinarily survive ripeness challenges even when actions toward the enforcement of the challenged laws have not been taken. *See, e.g., Times Film Corp.,* 365 U.S. at 45–46, 81 S.Ct. at 392–93; *Browning-Ferris Industries,* 799 F.2d at 1477 & n. 3. In addition, in cases in which "further factual development would not render the issue more concrete," the ripeness doctrine will not stand in the way of judicial review. *Assiniboine and Sioux Tribes v. Board of Oil and Gas Conservation,* 792 F.2d 782, 789 (9th Cir.1986); *see also Babbitt,* 442 U.S. at 297–301, 99 S.Ct. at 2308–10 (constitutional challenge to statutory election procedures ripe even though

plaintiffs had not yet invoked those procedures since no factual record was needed to address issues raised); *Pacific Legal Foundation v. State Energy Resources Conservation & Development Comm'n,* 659 F.2d 903, 917 (9th Cir.1981) (challenge to statute requiring utilities to include three alternate sites in a "notice of intention" to build a nuclear power plant ripe, even though no utility had submitted a notice of intention containing less than three sites). In cases where the facial validity of a statute is challenged, or where further factual development will not alter the legal inquiry that must be made, the issues presented are "purely legal," *Pacific Gas & Electric,* 461 U.S. at 201, 103 S.Ct. at 1720, nothing would be gained by delaying decision, "and the public interest would be well served by a prompt resolution of the constitutionality" of the challenged statute. *Thomas,* 473 U.S. at 582, 105 S.Ct. at 3333; *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 82, 98 S.Ct. 2620, 2635, 57 L.Ed.2d 595 (1978).

■ Applying these basic outlines to the case at bar, the court finds LILCO's bill of attainder and equal protection claims, as well as its due process claims not based on an "unconstitutional taking" theory, are ripe for consideration since they present facial constitutional challenges to the Used and Useful Act and the LIPA Act. It does not appear that the issues presented would be honed or clarified by further factual development, and thus no benefit would be gained by delaying decision on these claims. The court reaches a different conclusion, however, with regard to LILCO's "unconstitutional taking" claims.

LILCO argues that, when read together, the LIPA Act and the Used and Useful Act will enable LIPA to acquire LILCO through a tender offer without fairly compensating the utility's shareholders for the costs of Shoreham. In brief, LILCO asserts that the Used and Useful Act poses an imminent threat of significantly reducing the value of LILCO's stock, or even bankrupting the company, particularly in light of LILCO's difficulty in obtaining a

full power operating license from the NRC in the face of opposition by state and county authorities. This threat could make a tender offer by LIPA which might otherwise be deemed inadequate seem more attractive to LILCO's shareholders, thereby enabling the authority (or one of its subsidiaries) to acquire LILCO's shares without paying for a substantial portion of the Shoreham investment. Indeed, there is evidence that these companion acts were designed to accomplish just this end. LILCO also maintains that the Used and Useful Act alone constitutes an uncompensated regulatory taking violative of the constitution because it will prevent the PSC from setting "just and reasonable" rates in accordance with the mandate of *Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). LILCO attacks these statutes under both the takings clause of the fifth amendment and the due process clause of the fourteenth amendment. The problem with these claims is that no tender offer has been made pursuant to the terms of the LIPA Act, and the PSC has not yet been faced with the dilemma of setting a "just and reasonable" rate while excluding a $4.766 billion investment from the revenue requirement of a utility with a current net worth of approximately $3.3 billion. *See* Affidavit of George J. Sideris, Doc. 13, ¶ 6. As touched upon above and now discussed in greater detail, the substantive nature of LILCO's "unconstitutional taking" claims, in contrast to its other constitutional challenges to the two acts, renders these claims presently "unfit" for judicial resolution.

■ Turning to LILCO's takings clause claims first, the court must begin with the fundamental principle that "[t]he [f]ifth [a]mendment does not proscribe the taking of property; it proscribes taking without just compensation." *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. at 194, 105 S.Ct. at 3121. The fifth amendment does not require that just compensation be paid in advance of or contemporaneously with the taking. *Id.; see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). Until an actual taking has occurred, an action under the takings clause does not lie.

■ The determination of *whether* a taking has occurred, particularly in cases where the state has not yet physically invaded the property in question, necessarily involves "essentially ad hoc, factual inquiries." *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979); *see also Keystone Bituminous Coal Ass'n v. DeBenedictis*, — U.S. ——, 107 S.Ct. 1232, 1247, 94 L.Ed.2d 472 (1987); *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986); *Hodel v. Virginia Surface Mining and Reclamation Ass'n, Inc.*, 452 U.S. 264, 294–96, 101 S.Ct. 2352, 2369–70, 69 L.Ed.2d 1 (1981); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). In such cases, a "taking" within the meaning of the fifth amendment "may result from a taking of the *use* of property ... quite as well as from the taking of the title." *Chicago, R.I. & P. Ry. Co. v. United States*, 284 U.S. 80, 96, 52 S.Ct. 87, 92, 76 L.Ed. 177 (1931) (emphasis added). However, there exists no "'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Rather, the Supreme Court has identified several considerations that must be weighed in assessing fifth amendment takings clause claims, including the character of the government action, the economic impact of that action, and the manner in which it interferes with "reasonable investment backed expectations." *Kaiser Aetna*, 444 U.S. at 175, 100 S.Ct. at 390. At this point, the court cannot determine whether in *applying* either of the challenged statutes the state will effect a taking, since such a determination requires a more fully developed factual background. Until a taking is effected, the court cannot address whether "just compensation" has been afforded. It cannot be determined

whether a tender offer by LIPA is constitutionally adequate under the takings clause until it has been made; it cannot be determined whether the standards of *Hope Natural Gas* can be met with the Used and Useful Act in effect until the PSC actually sets LILCO's rates with the Act's restrictions in effect.

LILCO's takings clause claim is presented in the context of a facial attack on the Used and Useful Act and the LIPA Act. Consequently, the only ripe issue presented in this case under the takings clause is whether the "mere enactment" of either act constitutes a taking. *Keystone Bituminous Coal,* 107 S.Ct. at 1247; *Hodel v. Virginia Surface Mining,* 452 U.S. at 295, 101 S.Ct. at 2370; *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). The test in assessing such facial challenges is whether the statute regulating the uses that can be made of property "does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land...." *Agins,* 447 U.S. at 260, 100 S.Ct. at 2141 (citing *Nectow v. Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928) and *Penn Central,* 438 U.S. at 138 n. 36, 98 S.Ct. at 2666 n. 36). Neither the enactment of the Used and Useful Act nor the passage of the LIPA Act effects a taking under this test.

■ The regulation of rates charged by private utilities whose property is devoted to public uses has long been considered near the core of a state's police power. *See Munn v. Illinois,* 94 U.S. (4 Otto) 113, 133–34, 24 L.Ed. 77 (1877); *see also Federal Communications Comm'n v. Florida Power Corp.,* — U.S. —, 107 S.Ct. 1107, 1113, 94 L.Ed.2d 282 (1987); *Permian Basin Area Rate Cases,* 390 U.S. 747, 768–70, 88 S.Ct. 1344, 1360–61, 20 L.Ed.2d 312 (1968). There is a long-standing policy allowing states great latitude in devising the method in which they will determine an electric utility's "just and reasonable" rates. *Hope Natural Gas,* 320 U.S. 591, 64 S.Ct. 281. The Used and Useful Act is an example of the sort of regulation that has traditionally been deemed a legitimate exercise of a state's police power and clearly advances legitimate state interests. Although there is evidence that the passage of the Used and Useful Act may have reduced the value of LILCO's stock and hindered LILCO's attempts to refinance its debts, these detriments, though palpable, do not rise above the type of harms that are commonly suffered when legislative acts re-adjust economic benefits and burdens. *See Connolly,* 106 S.Ct. at 1025. The enactment of the Used and Useful Act, in and of itself, has not completely denied LILCO all economically viable uses of any of its property, and the Act may never have such an effect if LILCO obtains a full-power operating license from the NRC before January 1989. A facial constitutional challenge to the Act under the takings clause must fail.

■ The LIPA Act contemplates a less traditional exercise of a state's police power: the takeover of private property has traditionally been accomplished by the exercise of a state's power of eminent domain, not by a hostile tender offer approximating the techniques of Wall Street's "greenmailers" and "corporate raiders." But the underlying interests advanced by this legislation are no less legitimate because of the innovative means employed to accomplish those ends. New York's legislature has concluded that the escalating cost of electricity in LILCO's service area poses a serious threat to the health, safety and economic well-being of the residents of that service area, and that if the acquisition of LILCO by a public authority will result in improved and less expensive service, that acquisition should be made. These are the same concerns that motivate states and municipalities to acquire privately-owned utilities through condemnation proceedings, and such an exercise of the state's power of eminent domain has long been considered legitimate. *See Long Island Water Supply Co. v. Brooklyn,* 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165 (1897). The court concludes that the LIPA Act, too, advances legitimate state interests. LILCO has failed to demonstrate that the LIPA Act, in and of itself, denies the company all economically viable uses for its

property. Indeed, no provision of the LIPA Act, in contrast to the Used and Useful Act, appears to have had an immediate economic effect on LILCO; the LIPA Act will not enable the state authority to effect a taking unless and until the trustees of LIPA determine that public takeover of the utility is advisable.[9] Therefore, any facial challenge to the LIPA Act under the takings clause must also fail.

The court is fully aware that the underlying purpose served by the takings clause of the fifth amendment is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960); *see Connolly,* 106 S.Ct. at 1027. Shoreham is the result of a national policy fostered by federal and state agencies to "encourage[ ] the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing." *Duke Power Co.,* 438 U.S. at 63, 98 S.Ct. at 2625; *see also Jersey Central Power & Light Co. v. Federal Energy Regulatory Comm'n,* 810 F.2d 1168, 1170–71 (D.C.Cir.1987). This court has serious reservations about the fairness of imposing the costs incurred when that policy fails and a nuclear power plant constructed in accordance with that policy and under the constant scrutiny of the state's own Public Service Commission cannot be put to safe and economical use. Nonetheless, the court need not address this problem at this time. LILCO's facial challenges to the Used and Useful Act and the LIPA Act under the takings clause fail to state claims upon which relief can be granted, and LILCO's other arguments under the takings clause are not ripe for decision. Consequently, Counts II and VI of LILCO's complaint must be dismissed.

■ LILCO's argument that the Used and Useful Act is a "taking" that violates the due process clause of the fourteenth amendment is also not ripe for decision. LILCO maintains that regulations that "go too far" and are functionally equivalent to a taking by eminent domain are an invalid exercise of the state's police power and violate due process, and that the Used and Useful Act "goes too far." The theory is that if the State of New York wishes to accomplish the ends it is attempting to achieve through the Used and Useful Act, it must proceed through the exercise of its eminent domain power. LILCO urges that the remedy for an illegitimate exercise of the State's police power in lieu of the State's established eminent domain procedures is not just compensation but instead the invalidation of the offensive legislation. This due process theory has yet to be embraced or rejected by the Supreme Court. *See Williamson,* 473 U.S. at 197–200, 105 S.Ct. at 3122–24.

The notion that regulations that "go too far" should be considered a violation of the fourteenth amendment's due process clause rather than the takings clause of the fifth amendment is derived from language in Justice Holmes's opinion in *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922):

Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act.

*Id.* at 413, 43 S.Ct. at 159; *see also Block v. Hirsch,* 256 U.S. 135, 156, 41 S.Ct. 458, 459, 65 L.Ed. 865 (1921); *Hudson County Water Co. v. McCarter,* 209 U.S. 349, 355, 28

---

**9.** Section 1020–q(3) of the Act, which concerns LILCO's present state court actions for tax refunds, might arguably effect a taking on its face. That provision, however, cannot fairly be read to apply to LILCO. *See infra* at 401–02.

S.Ct. 529, 531, 52 L.Ed. 828 (1908); *Martin v. District of Columbia,* 205 U.S. 135, 139, 27 S.Ct. 440, 441, 51 L.Ed. 743 (1907). In *Williamson,* a due process challenge similar to that raised by LILCO was deemed premature and not passed upon by the Supreme Court. *See* 473 U.S. at 199–200, 105 S.Ct. at 3123–24. In *Williamson,* a successor in interest to certain developers challenged a county zoning ordinance which allegedly denied the developers "economically viable" use of their property. The Supreme Court held that, even if it were assumed that a zoning ordinance that "goes too far" is an invalid exercise of the police power rather than a fifth amendment taking, there would remain

> the difficult problem of how to define "too far," that is, how to distinguish the point at which regulation becomes so onerous that it has the same effect as an appropriation of the property through eminent domain or physical possession. As we have noted, resolution of that question depends, in significant part, upon an analysis of the effect the [Williamson County Regional Planning] Commission's application of the zoning ordinance and subdivision regulations had on the value of respondent's property and investment-backed profit expectations. That effect cannot be measured until a final decision is made as to how the regulations will be applied to respondent's property.

*Id.* at 199–200, 105 S.Ct. at 3123–24 (footnote omitted). Similarly, LILCO's claims predicated on a theory that the Used and Useful Act effects a "taking" in violation of due process, even if accepted by this court, are premature, largely for the same reasons that LILCO's fifth amendment takings clause claims are not ripe. Until the PSC has set rates with the Used and Useful Act in effect, it cannot be determined whether that statute is a regulation that "goes too far" within the meaning of *Pennsylvania Coal.*

### B. *Abstention*

The various defendants urge the court to refrain from exercising its jurisdiction over this case under the doctrine of abstention.

The abstention "doctrine" actually consists of a series of equitable doctrines inspired by the interests of comity and federalism. These doctrines carve out "an extraordinary and narrow exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it," *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959), and the general rule remains that "[w]ith whatever doubts, with whatever difficulties, a case may be attended, [the federal courts] must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 404, 5 L.Ed. 257 (1821) (Marshall, C.J.). The various categories of abstention "are not watertight" or amenable to mechanical application. *Law Enforcement Ins. Co., Ltd. v. Corcoran,* 807 F.2d 38, 40 (2d Cir.1986). In assessing the appropriateness of abstention, a federal court must identify the factors material to the most closely applicable categories and conduct "a careful balancing of the important factors as they apply in a given case, with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Memorial Hopital v. Mercury Construction Corp.,* 460 U.S. 1, 16, 103 S.Ct. 927, 937, 74 L.Ed.2d 765 (1983). With these principles in mind, the court turns to defendants' contentions, which stem from the leading cases of *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943) ("*Burford* abstention"); *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), and *Louisiana Power & Light Co. v. City of Thibodaux,* 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959) ("*Allegheny-Thibodaux* abstention," a conceptual subset of *Burford* abstention); and *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) ("*Pullman* abstention").

■■■■■■ *Burford* abstention is properly invoked when (1) the order, regulation, or provision attacked in federal court relates to a sophisticated state regulatory scheme

involving complex subject matter of special state interest in which judicial review of administrative decisions by state courts is considered an integral part of that scheme because it promotes uniformity by minimizing the potential for multiple inconsistent adjudications and helps assure that the tribunal of choice possesses a certain degree of expertise in the complex subject matter involved; (2) the exercise of jurisdiction by the federal courts threatens to disrupt the state's regulatory scheme; and (3) the action brought in federal court largely involves issues of state law. *Corcoran,* 807 F.2d at 43; *see also Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). In the case at bar, these considerations do not justify the refusal on the part of the court to exercise jurisdiction over LILCO's claims.

Defendants argue that the LIPA Act creates a specialized scheme for determining just compensation should LIPA decide to invoke the power of eminent domain and condemn LILCO's property or securities. *See* N.Y.Pub.Auth.Law § 1020–h. As an integral part of that scheme, the Supreme Court for the State of New York sitting in the district in which LILCO maintains its principal office is given "exclusive jurisdiction to hear and determine all claims arising from the acquisition of stock by the exercise of the power of eminent domain" and is to hear such claims without a jury and without referring the matter to a referee or commissioner. N.Y.Pub.Auth.Law § 1020–h(5)(d). Further, should LILCO's real or personal property be condemned, LIPA is to petition the Supreme Court sitting in the district where the property is located for the acquisition of such property. N.Y.Pub.Auth.Law § 1020–h(6). Similarly, defendants argue that the Used and Useful Act affects ratemaking determinations that are better left to the expertise of the Public Service Commission. On these grounds, defendants urge the application of *Burford* abstention.

Defendants' argument misapprehends the nature of LILCO's claims and the limited nature of *Burford* abstention. LILCO is not attacking the application of a complex regulatory scheme but instead the constitutionality of the statutes which put that scheme into place. This distinction is fundamental to the question of whether the rule of *Burford v. Sun Oil Co.* applies in this case. Resolution of LILCO's claims will not threaten the uniform *application* of any regulatory scheme by creating potentially inconsistent interpretations of those regulations, nor do the issues raised in LILCO's Complaint require special expertise beyond the province of this court. *See Harris v. Pernsley,* 755 F.2d 338, 344 (3d Cir.), *cert. denied,* 474 U.S. 965, 106 S.Ct. 331, 88 L.Ed.2d 314 (1985). Indeed, the questions raised involve issues of federal constitutional law appropriately resolved by the federal courts. It does not appear that the existence of a federal constitutional issue precludes *Burford* abstention, since *Burford* itself involved a constitutional question, as did *Alabama Public Service Comm'n v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), but the abstention doctrine was nonetheless found to be applicable in both cases. Still, when federal law issues predominate, abstention is not favored. *See Corcoran,* 807 F.2d at 43–44; *Harris,* 755 F.2d at 344; *United States v. Adair,* 723 F.2d 1394, 1402 n. 5 (9th Cir.1983), *cert. denied,* 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984); *Markel v. Blum,* 509 F.Supp. 942, 948 (N.D.N.Y.1981). The court concludes that abstention is not mandated by *Burford* and its progeny.

■ The Supreme Court's decisions in *Allegheny* and *Thibodaux* do not change this result. These virtually irreconcilable cases, decided on the same day by the Supreme Court, have had the effect of establishing a special "eminent domain" subcategory of *Burford* abstention.[10] In *Thi-*

---

**10.** One scholar has conceptualized *Burford* and *Thibodaux* as representing distinct abstention doctrines. *See* Field, *Abstention in Constitutional Cases: The Scope of the* Pullman *Abstention Doctrine,* 122 U.Pa.L.Rev. 1071, 1148–63 (1974). In *Colorado River Water Conservation District v. United States,* the Supreme Court analyzed *Burford, Allegheny,* and *Thibodaux* under the same

*bodaux,* the Court found that the district court properly abstained in a case directly concerning a state's exercise of its power of eminent domain, because eminent domain

> is intimately involved with sovereign perrogative.... The issues normally turn on legislation with much local variation interpreted in local settings.... [C]onsiderations ... for avoiding the hazards of serious disruption by federal courts of state government or needless friction between state and federal authorities are ... appropriate in a state eminent domain proceeding brought in, or removed to, a federal court.

360 U.S. at 28, 79 S.Ct. at 1073. In *Allegheny,* however, the Court found abstention inappropriate in a case factually similar to *Thibodaux,* stating that "the federal courts have been adjudicating cases involving issues of state eminent domain law for many years, without any suggestion that there was entailed a hazard of friction in federal-state regulations." 360 U.S. at 192, 79 S.Ct. at 1065. Justice Stewart attempted to explain away the different results reached in the two cases by noting that in *Allegheny* the state law was established, while in *Thibodaux* a new statute which had yet to be construed by the state courts was involved. *See Thibodaux,* 360 U.S. at 31, 79 S.Ct. at 1074 (Stewart, J., concurring). The LIPA Act, too, is a newly-enacted statute involving in part a state's power of eminent domain, and in that regard is closer to *Thibodaux* than *Allegheny.* Nonetheless, the court concludes that the law of abstention as it has developed in cases involving the state's power of eminent domain does not require that the court refrain from deciding the issues raised in the case at bar.

First of all, the eminent domain powers of LIPA are only one aspect of the LIPA Act that is challenged by LILCO. Further, LILCO's lawsuit does not focus on the actual application of the eminent domain procedures provided but instead presents constitutional challenges to an entire statutory scheme. Cf. *Heritage Farms, Inc. v. Sole-*

*bury Township,* 671 F.2d 743, 748 (3d Cir.), *cert. denied,* 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982) ("It is incumbent upon district courts, faced with a claim arising out of land use questions, to examine the facts carefully to determine what the essence of the claim is. If it is an unlawful conspiracy [to deny plaintiffs' of their constitutional rights] like the one alleged here, the mere presence of land use issues should not trigger a mechanical decision to abstain.") Finally, it appears that to the extent (if any) that cases involving the state's power of eminent domain differ from "mainstream" *Burford* abstention cases in analytical approach, the existence of colorable constitutional claims in *Thibodaux*-type cases not only cautions against abstention, but may actually preclude the operation of the doctrine. *See Colorado River,* 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21.

Defendant Cuomo and the LIPA defendants also argue that the court should abstain under the *Pullman* doctrine. Part of LILCO's challenge to the LIPA Act is an attack on § 1020–q of the Public Authorities Law, which is designed to ameliorate the impact of the loss of tax revenue for local taxing authorities that would result from the closing of Shoreham in the event LIPA acquires LILCO. Specifically, LILCO objects to § 1020–q(3), which provides that

> [n]o municipality or governmental subdivision, including a school district or special district, shall be liable *to the authority or any other entity* for a refund of property taxes originally assessed against the Shoreham plant. Any judicial determination that the Shoreham plant assessment was excessive, unequal or unlawful for any of the years from nineteen hundred seventy-six to the effective date of this title shall not result in a refund by any taxing jurisdiction of taxes previously paid by LILCO pursuant to such Shoreham plant assessment. The authority shall discontinue and aban-

general abstention category, but distinguished *Burford* and *Alabama Public Service Comm'n,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951),

from *Allegheny* and *Thibodaux* in a footnote. *See Colorado River,* 424 U.S. at 815 n. 21, 96 S.Ct. at 1245 n. 21.

don all proceedings, brought by its predecessor in interest, which seek the repayment of all or part of the taxes assessed against the Shoreham plant.

N.Y.Pub.Auth.Law § 1020–q(3) (emphasis added). LILCO claims that if the reference to "the authority or any other entity" includes LILCO itself, this subsection violates due process. Defendant Cuomo and the LIPA defendants maintain that when read as a whole, § 1020–q clearly applies only to LIPA, any subsidiary established by LIPA, or possibly LIPA's successor in interest should the authority subsequently convey the Shoreham plant or the property on which it sits.

The *Pullman* doctrine addresses the problems posed "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 236, 104 S.Ct. 2321, 2326, 81 L.Ed.2d 186 (1984). In such cases, an equitable decision to abstain and stay proceedings in federal court until a state court resolves those state law issues may serve to "avoid both unnecessary adjudication of federal questions and 'needless friction with state policies....' " *Id.* (quoting *Pullman,* 312 U.S. at 500, 61 S.Ct. at 645). However, a federal court need not abstain every time a difficult state law issue is raised or a newly-enacted state statute which has not been construed by a state court is challenged. Abstention from the exercise of federal jurisdiction remains "the exception, not the rule." *Colorado River,* 424 U.S. at 813, 96 S.Ct. at 1244. The Second Circuit has identified three essential elements which must be present before *Pullman* abstention may be invoked: (1) The state statute to be construed or the state law to be applied must be uncertain; (2) resolution of the federal issues presented must depend upon the construction to be given to the ambiguous state law; and (3) the state law must be susceptible of an interpretation that would render decision of the federal constitutional question unnecessary or would materially alter the nature of the constitutional questions raised. *McRedmond v. Wilson,* 533 F.2d 757, 761 (2d Cir.1976); *see*

*also West v. Village of Morrisville,* 728 F.2d 130, 133–34 (2d Cir.1984); *Canaday v. Koch,* 608 F.Supp. 1460, 1467 (S.D.N.Y.), *aff'd,* 768 F.2d 501 (1985).

In deciding whether to stay its hand, the court must be cognizant of the fact that abstention "often imposes a substantial cost in delay, expense and legal uncertainty." *Professional Plan Examiners of New Jersey, Inc. v. LeFante,* 750 F.2d 282, 290 (3d Cir.1984). As the Supreme Court has observed, "[t]here is a point ... at which the possible benefits of abstention become too speculative to justify or require avoidance of the [state law] question presented." *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 481, 97 S.Ct. 1898, 1905, 52 L.Ed.2d 513 (1977). In the present case, that point has been passed. LILCO's constitutional challenge to § 1020–q(3) is tangential to the main thrust of its broad-based attack on Chapters 517 and 518 of New York's laws of 1986. Thus, "[r]esolution of the supposedly unsettled question of state law could not obviate the need for resolution of the federal constitutional and statutory issues, but at most would eliminate one of many subsidiary contentions." *Professional Plan Examiners,* 750 F.2d at 290. On this basis, the court concludes that resolution of the federal questions presented cannot fairly be said to "depend upon the interpretation to be given to the state law" at issue, *McRedmond,* 533 F.2d at 761, and thus staying this action in accordance with the rule of *Pullman* is inappropriate.

Furthermore, the court believes that § 1020–q(3), when read in context and with the overall purpose of §§ 1020–p and 1020–q in mind, is not all that ambiguous. Section 1020–p exempts LIPA from paying property taxes. N.Y.Pub.Auth.Law § 1020–p(2) and (3). The removal of Shoreham as a source of tax income poses a grave financial burden on local taxing jurisdictions that had depended on such tax income to fund the public services they provided. Section 1020–q was devised as a means to ease the transition for these local taxing jurisdictions to other sources of revenue. N.Y.Pub.Auth.Law § 1020–q.

Thus, it is provided that LIPA will make payments in lieu of property taxes to municipalities and school districts over a ten year period in progressively decreasing amounts "after property theretofore owned by LILCO is acquired by the authority." N.Y.Pub.Auth.Law § 1020–q(1). Subsection 1020–q(3), quoted above, is another device intended to alleviate some of the financial burden to local taxing jurisdictions that would result if Shoreham were removed as a potential source of tax revenue. It seems clear that the legislature intended that the terms of § 1020–q(3) would only apply if LILCO is taken over by LIPA, and thus that subsection's reference to "the authority or any other entity" does not apply to LILCO (unless it somehow becomes a successor in interest to LIPA in the property at issue). Because the court believes that the meaning and intended scope of § 1020–q(3) is not uncertain, the *Pullman* doctrine does not mandate abstention in this case. *McRedmond*, 533 F.2d at 761. Defendants' contentions that the court should refrain from deciding the issues that remain before it must be rejected.[11]

### C. *Bills of Attainder*

LILCO alleges that both the Used and Useful Act and the LIPA Act were designed to punish the utility for the construction of Shoreham and other perceived incidents of mismanagement, and thus are bills of attainder violative of article I, § 10 of the Constitution. Article I's prohibition on bills of attainder[12] is directed at "[t]he evil of government deciding to inflict burdens on identified persons without their participation in an adversary hearing...." L. Tribe, *American Constitutional Law* 484 (1978). Bills of attainder within the meaning of Article I are "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946). Subsumed within this definition are both common law bills of attainder, which carried with them the penalty of death, and common law bills of pains and penalties, which carried lesser punishments. *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 323, 18 L.Ed. 356 (1866); *Fletcher v. Peck*, 10 U.S. (6 Cranch.) 87, 132, 3 L.Ed. 162 (1810). At its essence, the Constitution's prohibition of bills of attainder is inseparably tied to the structural separation of powers among the various branches and levels of government motivated by the perception that "[t]he accumulation of all powers legislative, executive and judiciary in the same hands, whether of

---

**11.** Defendant Cuomo and the PSC defendants also argue that the Johnson Act of 1934, 28 U.S.C. § 1342, strips this court of jurisdiction to hear LILCO's claims pertaining to the Used and Useful Act. The Johnson Act reads:

The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision, where:

(1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,

(2) The order does not interfere with interstate commerce; and,

(3) The order has been made after reasonable notice and hearing; and,

(4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342. The Act has been "construed broadly to oust federal courts of jurisdiction over all challenges affecting rates." *Miller v. New York State Public Service Comm'n*, 807 F.2d 28, 31 (2d Cir.1986); *Hanna Mining Co. v. Minnesota Power & Light Co.*, 739 F.2d 1368, 1370 (8th Cir.1984); *Tennyson v. Gas Service Co.*, 506 F.2d 1135 (10th Cir.1974). The language and statutory history of the Johnson Act reveals a clear intent "to keep constitutional challenges to orders affecting rates out of the federal courts 'lock, stock and barrel.'" *Tennyson*, 506 F.2d at 1138. However, LILCO does not challenge a rate order by the PSC but instead attacks a statute, the Used and Useful Act, which could affect the PSC's ratemaking decisions in the future. Accordingly, the Johnson Act does not bar LILCO's claims. *See Public Utilities Comm'n of California v. United States*, 355 U.S. 534, 540, 78 S.Ct. 446, 450, 2 L.Ed.2d 470 (1958) (a statute requiring submission of rates for approval is not a "rate order" and thus can be challenged in federal court).

**12.** Article I, § 9, cl. 3 forbids the federal government from enacting bills of attainder, and Article, I, § 10, cl. 1 contains a similar limitation upon the states.

one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." *The Federalist* No. 47, at 324 (J. Madison) (J. Cooke ed. 1961); *see Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 960–62, 103 S.Ct. 2764, 2788–89, 77 L.Ed.2d 317 (1983) (Powell, J., concurring); *Linnas v. Immigration and Naturalization Service,* 790 F.2d 1024, 1028 (2d Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986). Such bills represent a legislative encroachment on powers more properly assumed by the judiciary, thus creating "the danger of subjecting the determination of the rights of one person to the 'tyranny of shifting majorities.'" *INS v. Chadha,* 462 U.S. at 961, 103 S.Ct. at 89 (Powell, J., concurring).

Of course, all modern legislation regulating the economic activities of specific groups might be considered "punishments," and the bill of attainder clause, if read too broadly, could be used to cripple the ability of legislatures to respond to some perceived social or economic problem by imposing restrictions or limitations on individuals, corporations, or industries which are deemed responsible for the problem. Consequently, the bill of attainder clause has been used sparingly in invalidating legislation. It has been applied only to legislation closely paralleling the historical characteristics of common law bills of attainder and bills of pains and penalties, the most important of which is a design to "inflict[ ] its deprivation upon the members of a political group thought to present a threat to national security." *United States v. Brown,* 381 U.S. 437, 453, 85 S.Ct. 1707, 1717, 14 L.Ed.2d 484 (1965). Bills of attainder historically have been passed in times of war or rebellion, or when some menace to domestic tranquility was perceived. The court is aware of only four cases decided by the Supreme Court since the Civil War in which a statute was invalidated under the bill of attainder clause, and all four involved legislative sanctions against perceived "traitors" or "subversives": *Cummings v. Missouri,* 71 U.S. (4 Wall.) 277, 71 U.S. 277, 18 L.Ed. 356 (1867) (state law requiring priests to take an oath

that they had never aided the Confederacy struck down); *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1867) (congressional statute requiring attorneys practicing in federal courts to swear they had never aided the Confederacy invalidated); *United States v. Lovett,* 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (congressional statute singling out and denying compensation to three named government employees who had been accused of being "subversives" and had been investigated by the House Un-American Activities Committee invalidated); *United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (federal statute making it a crime for a member of the Communist Party to serve as an officer in a labor union declared unconstitutional).

■■■ In determining whether a legislative enactment is an unlawful bill of attainder, the court must determine whether the challenged law inflicts punishment on specifically designated individuals or groups without the benefit of a judicial trial. *Brown,* 381 U.S. at 447–49, 85 S.Ct. at 1714–15 (1965). The specificity element is present if the challenged act singles out a person or identifiable group either by name or by describing those affected by the act "in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party of United States v. Subversive Activities Control Board,* 367 U.S. 1, 86, 81 S.Ct. 1357, 1405, 6 L.Ed.2d 625 (1961). In determining whether a particular act inflicts "punishment," three inquiries must be made: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a [legislative] intent to punish.'" *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841, 852, 104 S.Ct. 3348, 3355, 82 L.Ed.2d 632 (1984) (quoting *Nixon v. Administrator of General Services,* 433

U.S. 425, 473, 475–478, 97 S.Ct. 2777, 2805, 2806–08, 53 L.Ed.2d 867 (1977)).

■ Both the LIPA Act and the Used and Useful Act apply exclusively to LILCO. The LIPA Act targets LILCO by name; the Used and Useful Act is applicable only to nuclear power plants "not commercially used and useful in the actual generation of electricity on the effective date of [the Act] and which is owned by a single utility on or after the effective date of [the Act]," N.Y. Pub.Serv.Law § 66(24)(a), characteristics unique to the Shoreham plant at the time the Act was drafted. The court concludes that the specificity element is present in both acts.

■ Neither act, however, inflicts "punishment" within the meaning of the bill of attainder clause. Turning to the first factor identified by the Supreme Court in *Selective Service* as relevant to whether a legislative act imposes "punishment," neither the Used and Useful Act nor the LIPA Act impose burdens historically associated with the type of "punishments" that inspired the Framers to draft the prohibition against bills of attainder. As noted above, at common law bills of attainder carried with them the death penalty, while bills of pains and penalties usually involved imprisonment, banishment, or the punitive confiscation of property. *Selective Service,* 468 U.S. at 852, 104 S.Ct. at 3355. In the post-Revolutionary War period, an additional punishment acquired the status of those legislative punishments and has been found to violate the bill of attainder clause: the erection of bars to participation by individuals or groups in specific employments or professions. *See, e.g., Brown,* 381 U.S. 437, 85 S.Ct. 1707; *Lovett,* 328 U.S. 303; *Cummings,* 71 U.S. (4 Wall.) 277, 18 L.Ed. 356; *Ex parte Garland,* 71 U.S. (4 Wall.) 333, 18 L.Ed. 366. LILCO claims that the Used and Useful Act and the LIPA Act impose economic disabilities and deprivations on the utility in retaliation for its past conduct in constructing Shoreham, and thus in essence mandate the "punitive confiscation" of certain of its property interests. However, the LIPA Act provides compensation for any property LIPA may acquire pursuant to the Act's terms. The constitutional adequacy of that compensation may well come into question if and when a tender offer or condemnation pursuant to the LIPA Act occurs, but the mere fact that compensation of some sort is contemplated takes the terms of the LIPA Act outside the traditional meaning of a "punitive confiscation" barred by the bill of attainder clause. *See Nixon,* 433 U.S. at 475, 97 S.Ct. at 2806. Moreover, the terms of the Used and Useful Act do not make LILCO's loss of its Shoreham investment inevitable, since it is conceivable LILCO will obtain a full-power operating license from the NRC before some event triggering the terms of the Act occurs. Finally, and most importantly, the challenged statutes are not "[g]enerally addressed to persons considered disloyal to the Crown or State." *Id.* at 474. As noted above, this is the most telling characteristic of a statute falling within the historical meaning of legislative punishment.

The court's analysis cannot stop here, however. In recognition of the ability of innovative and resourceful legislators to devise new methods for penalizing unpopular individuals or groups, the Supreme Court mandates that "[t]o ensure that the [l]egislature has not created an impermissible penalty not previously held to be within the proscription against bills of attainder, [the court] must determine whether the challenged statute[s] can be reasonably said to further nonpunitive goals." *Selective Service,* 468 U.S. at 853–54, 104 S.Ct. at 3356. Both of the acts challenged by LILCO satisfy this test. First, there is nothing in the "used and useful" approach to ratemaking that is in and of itself constitutionally impermissible. Due process requires that the rate set for a utility be "just and reasonable," but does not dictate that a just and reasonable result be reached by any particular method. *Hope Natural Gas,* 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944).[13] It is clearly within the discretion of the legislature to

---

**13.** In construing the Natural Gas Act of 1938 (codified as amended at 15 U.S.C. §§ 717c(a), 717d(a)), the Supreme Court concluded that

decide, as a matter of ratemaking policy, that the costs of non-productive nuclear power plants should be excluded from the rate base of electric utilities. Similarly, the LIPA Act can be said to further legitimate, nonpunitive legislative goals. There is nothing impermissible in the state establishing a publicly-owned power authority to serve a particular service area in the hope that more reliable and more reasonably priced services for that area would result. The New York legislature has determined that LILCO cannot provide these services in a reliable, efficient and economical manner, *see* N.Y.Pub.Auth.Law § 1020–a, and the court cannot second-guess the wisdom of this determination but instead may only inquire into whether the Act can reasonably be said to further this clearly nonpunitive goal. The court finds that it does.

As to the third factor identified in *Selective Service*, LILCO has offered some evidence that certain individual legislators may have been motivated by an intent to punish LILCO for what they viewed as imprudent expenditures in connection with the Shoreham project. *See generally* Doc. 17. But the statements of a few individual legislators, in and of themselves, are inconclusive evidence that the legislature as a whole was motivated by an intent to penalize LILCO.

In sum, LILCO has failed to demonstrate that either the Used and Useful Act or the LIPA Act are "punishments" that violate the bill of attainder clause. Defendants' motion for summary judgment on Counts IV and VIII must be granted.

### D. *Substantive Due Process*

LILCO maintains that the Used and Useful Act and the LIPA Act represent abuses of the state's police power in violation of the due process clause of the fourteenth amendment because they were enacted with an impermissible purpose in mind: the facilitation of the public takeover of LILCO at an artificially depressed price. The court distinguishes this attack on the two companion acts from LILCO's due process argument that the Used and Useful Act constitutes a regulation that "goes too far" and is the functional equivalent to a taking by eminent domain. This latter argument, which the court has found to have been raised prematurely, *supra* at 46–48, necessarily depends on the economic impact the Used and Useful Act will have on LILCO when and if it goes into effect. The substantive due process argument the court now addresses focuses on the purposes to be served by the two challenged enactments, and is not dependent on the actual economic effect they will have on LILCO. As such, these facial challenges to the acts are ripe for judicial review.

Since the Supreme Court's landmark decision in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), the federal courts have consistently refused to limit the scope of the police power of the states in addressing perceived social and economic problems through economic legislation if that legislation does not impinge upon fundamental personal rights, and have been extremely deferential in assessing the reasonableness of actions taken pursuant to that police power. *See, e.g., Ferguson v. Skrupa*, 372 U.S. 726, 730, 83 S.Ct. 1028, 1031, 10 L.Ed.2d 93 (1963) ("We have returned to the original constitutional proposition that

it is the result reached not the method employed [in setting a utility's rates] which is controlling.... It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.... And he who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences. *Hope Natural Gas,* 320 U.S. at 602, 64 S.Ct. at 287 (citations omitted). The Court held that

judging a rate order's "consequences" required a "balancing of the investor and the consumer interests." *Id.* at 603, 64 S.Ct. at 288. This standard apparently coincides with the requirements of the due process and takings clauses of the Constitution. *See Federal Power Comm'n v. Natural Gas Pipeline Co.,* 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942); *Jersey Central Power & Light Co. v. Federal Energy Regulatory Comm'n,* 810 F.2d 1168, 1175 (D.C.Cir.1987) (en banc).

courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.... Legislative bodies have broad scope to experiment with economic problems....”); *Lincoln Federal Labor Union v. Northwestern Iron & Metal Co.*, 335 U.S. 525, 536, 69 S.Ct. 251, 257, 93 L.Ed. 212 (1949) (The Court “has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.”); *Olsen v. Nebraska,* 313 U.S. 236, 246, 61 S.Ct. 862, 865, 85 L.Ed. 1305 (1941) (“We are not concerned ... with the wisdom, need, or appropriateness of the legislation. Differences of opinion on that score suggest a choice which ‘should be left where ... it was left by the Constitution—to the States and to Congress.’ ” (citation omitted)). Many statutes potentially could serve illegitimate purposes as well as legitimate purposes. The mere fact that some illegitimate end might be furthered by some act regulating economic matters is irrelevant if some legitimate purpose is also served by the challenged legislation. The judicial inquiry to be made when a statute not affecting fundamental individual rights is challenged under the substantive due process doctrine is whether that statute bears a rational relationship to some legitimate state interest. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955). Both the Used and Useful Act and the LIPA Act pass this test.

 The legislative findings and declaration of purpose supporting the Used and Useful Act indicate that this statute amending New York’s Public Service Law was intended in part to protect customers of electric utilities from bearing the enormous costs of nuclear power plants that fail to operate by mandating that the Public Service Commission apply “used and useful” principles in setting the rates of certain utilities that own such plants. Ch. 518, § 1 of the laws of 1986 (McKinney’s Session Laws). Because they possess natural monopolies and are thus immune from the ordinary constraints of competitive market forces, and because of the importance to the public welfare of the services they provide, electric utilities have long been subjected to pervasive regulation by the states. *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm’n,* 461 U.S. 375, 377, 103 S.Ct. 1905, 1908, 76 L.Ed.2d 1 (1983); *see also Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 416–17, 103 S.Ct. 697, 707, 74 L.Ed.2d 569 (1983); *Munn v. Illinois,* 94 U.S. (4 Otto) 113, 130, 24 L.Ed. 77 (1877) (“[W]hen private property is devoted to a public use, it is subject to public regulation.”). The “used and useful” approach to ratemaking just as long has been deemed a legitimate method for calculating a utility’s rate base. *See, e.g., Denver Stock Yard Co. v. United States,* 304 U.S. 470, 475, 58 S.Ct. 990, 994, 82 L.Ed. 1469 (1938); *Smyth v. Ames,* 169 U.S. 466, 547, 18 S.Ct. 418, 434, 42 L.Ed. 819 (1898). Thus, LILCO’s challenge to the Used and Useful Act as an abuse of the state’s police power necessarily must fail. Defendants’ motion for summary judgment on Count III of the Complaint is granted.

 The legislative concerns inspiring the passage of the LIPA Act are set out in the Act itself. *See* N.Y.Pub.Auth.Law § 1020–a.[14] The legislature found that the excessive costs for electricity borne by LILCO’s customers and the lack of consumer confidence in LILCO’s ability to provide electricity in a reliable, efficient, and economical manner poses a “serious threat to the economic well-being, health and safety of the residents of and the commerce and industry in [LILCO’s] service area” not only by unduly burdening LILCO’s current customers but also by deterring new industry and commerce to locate in that area. *Id.* The legislature has concluded that the ill-fated Shoreham project is responsible for this crisis, and that the crisis “best can be

---

**14.** *See supra* note 5.

dealt with by replacing [LILCO] with a publicly owned power authority."

[S]uch an authority will provide safe and adequate service at rates which will be lower than the rates which would otherwise result and will facilitate the shifting of investment into more beneficial energy demand/energy supply management alternatives, realizing savings for the ratepayers and taxpayers in the service area and otherwise restoring the confidence and protecting the interests of ratepayers and the economy in the service area.

*Id.* As has been noted, New York's interest in assuring that dependable and affordable sources of energy exist for its residents and industry is particularly strong. *See Exxon Corp. v. Eagerton,* 462 U.S. 176, 196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983) (oil and gas prices); *Energy Group,* 459 U.S. at 416–17, 103 S.Ct. at 707 (protection of consumers from escalation of natural gas prices). Under the "rational basis" test utilized in assessing substantive due process challenges to economic legislation, this court cannot second guess the means chosen to secure these legitimate ends so long as the connection between ends and means is not wholly illusory, for "[w]hen the subject lies within the police power of the State, debatable questions as to reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment...." *Sproles v. Binford,* 286 U.S. 374, 388–89, 52 S.Ct. 581, 585, 76 L.Ed. 1167 (1932). The establishment of publicly-owned power authorities to provide energy for designated service areas is a constitutionally acceptable means to accomplish a legitimate end. Cf. *Long Island Water Supply Co. v. Brooklyn,* 166 U.S. 685, 689, 17 S.Ct. 718, 719, 41 L.Ed. 1165 (1897) ("All private property is held subject to the demands of a public use.... Whenever public uses require, the government may appropriate any private property on the payment of just compensation. That the supply of water to a city is a public purpose cannot be doubted, and hence the condemnation of a water supply system must be recognized as within the unquestioned limits of the power of eminent domain."). The LIPA Act as a whole withstands scrutiny under the "rational basis" test of substantive due process jurisprudence.

LILCO maintains that five individual provisions of the LIPA Act constitute abuses of the state's police power and that these provisions are integral to the Act as a whole, thus mandating invalidation of the entire Act. Specifically, LILCO claims that the LIPA Act impairs the ability of LILCO's Board of Directors to act solely on behalf of the utility's shareholders,[15] deprives LILCO's shareholders of protections afforded by New York's anti-takeover statutes,[16] deprives LILCO's shareholders of their "right" to approve or disapprove mergers by overriding certain provisions of New York's Business Corporation Law,[17] deprives LILCO of its causes of action for refunds of wrongly assessed property taxes,[18] and deprives the utility of its "right" to recover the amount of its prudent investment in Shoreham as determined by the PSC.[19] Each of these provisions, LILCO claims, was intentionally designed to depress the value of LILCO stock as a means for facilitating the public takeover of the utility and thus offends due process.

Section 1020–h(3)(d) of the LIPA Act requires LILCO's Board of Directors to "consider not only the dollar amount" of a tender offer from LIPA or one of LIPA's subsidiaries but also "the interests of employees, suppliers, ratepayers, creditors,

---

**15.** N.Y.Pub.Auth.Law § 1020–h(3)(d) (McKinney Supp.1987) (*see supra* note 5).

**16.** N.Y.Pub.Auth.Law § 1020–h(3)(c) (McKinney Supp.1987) (*see supra* note 5); *see also supra* note 6.

**17.** N.Y.Pub.Auth.Law § 1020–h(3)(b) (McKinney Supp.1987) (*see supra* note 5); *see also supra* note 7.

**18.** N.Y.Pub.Auth.Law § 1020–q(3) (McKinney Supp.1987) (*see supra* note 5).

**19.** N.Y.Pub.Auth.Law § 1020–h(9) (McKinney Supp.1987) (*see supra* note 5).

... and the economy of the service area and the state." N.Y.Pub.Auth.Law § 1020–h(3)(d). Under New York law, a director ordinarily must act at all times in the interest of the corporation and its shareholders. *Alpert v. Twenty-Eight Williams Street Corp.*, 63 N.Y.2d 557, 568–69, 483 N.Y.S.2d 667, 674–75, 473 N.E.2d 19, 26–27 (1984); 15 N.Y.Jur.2d *Business Relationships* § 993 (1981). It is unclear whether the vague terms of § 1020–h(3)(d) dilute this fiduciary obligation in any way, but even if they do LILCO has not demonstrated that such a dilution implicates constitutional concerns. It must be kept in mind that a corporation is purely a creature of the law, created by the Sovereign and possessing only those powers conferred upon it by the legislature. *Chicago Title and Trust Co. v. Forty-One Thirty-Six Wilcox Building Corp.*, 302 U.S. 120, 124–25, 58 S.Ct. 125, 126–27, 82 L.Ed. 147 (1937); *see Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629 (1819) (Marshall, C.J.). The nature of the fiduciary duties owed by corporate directors is a matter of state law which in and of itself has no independent constitutional dimension. So long as a state law governing corporate entities does not offend specific prohibitions of the Constitution nor conflict with acts of Congress, it constitutes a legitimate exercise of the state's police power.

▪ LILCO also objects to § 1020–h(3)(c), which exempts LIPA from the terms of § 912 of New York's Business Corporation Law.[20] Section 912(b) is designed to discourage hostile corporate takeovers by limiting the ability of an individual or corporation acquiring shares in a New York corporation to "engage in any business combination" with the target corporation for a period of five years unless the Board of Directors of the target corporation approves of the stock acquisition. N.Y.Bus.Corp.Law § 912(b) (McKinney 1986). Defendants argues that § 912 was in part a legislative response to fears that the hostile acquisition of New York-based corporations by other privately owned corporations could result in a reduced work force, negatively affecting the state's economy. This consideration would be irrelevant to the acquisition of LILCO by a public authority, defendants claim, and thus the legislature's decision to exempt LIPA from the requirements of § 912 was a legitimate exercise of the state's police power. The court agrees that this justification for § 1020–h(3)(c) is arguable, and this is enough to survive scrutiny under economic substantive due process.

▪ LILCO also challenges the constitutionality of § 1020–h(3)(b), which allows a LIPA subsidiary acquiring two-thirds of LILCO's common stock to merge with the utility. LILCO claims this provision effectively eliminates the rights of LILCO's shareholders to vote on proposed mergers, as provided in Article 9 of the BCL. Under Article 9, mergers can be accomplished in one of two ways. In most cases, the Board of Directors for both merging corporations must approve any proposed merger, and in addition two-thirds of *all* shareholders of each corporation, as well as a majority of the holders of each class of stock with voting rights issued by each corporation, must assent to any proposed deal. N.Y. Bus.Corp.Law §§ 902, 903(a)(2) (McKinney 1986). In cases where one corporation already owns ninety percent of another and seeks to merge with the second corporation, however, only the authorization of the first corporation's Board of Directors is necessary (a so-called "short form" merger). N.Y.Bus.Corp.Law § 905(a) (McKinney 1986). This latter provision of the BCL is generally utilized by parent corporations seeking to merge with one of its subsidiaries. LILCO argues that the LIPA Act effectively modifies the BCL's "short form" merger provision by allowing a subsidiary of LIPA which acquires only two-thirds (rather than ninety percent) of LILCO's common stock to force a merger without the consent of LILCO's shareholders. Again, LILCO fails to demonstrate how the due process clause stands as a barrier to such a modification. If it is within the power of the state to determine that a

20. *See supra* note 6.

corporation which controls ninety percent of another may swallow up the latter without a formal vote of the latter's shareholders, the court fails to see how it is an abuse of the state's police power to allow "short form" mergers when the dominant corporation owns only sixty-six and two-thirds percent of the other corporation.

LILCO also challenges § 1020–q(3), asserting that that subsection of the LIPA Act deprives it of its property interest in potential tax refunds and its right of access to the courts in violation of the due process clause. If the terms of § 1020–q(3) actually applied to LILCO, its due process argument would not be insubstantial. However, as explained above, *see supra* at 401–02, § 1020–q(3) cannot reasonably be construed to apply to LILCO. Thus, this attack on the LIPA Act must also fail.

■ Finally, LILCO objects to § 1020–h(9), which requires LIPA to close and decommission Shoreham once it has acquired sufficient shares of LILCO stock to do so. LILCO maintains that, like the Used and Useful Act, this provision of the LIPA Act deprives LILCO of its ability to recover the prudential costs associated with the Shoreham project. LILCO's challenge to § 1020–h(9) as an abuse of New York's police power must fail. Whether or not a particular nuclear power plant should operate within the state is a determination that fundamentally implicates the state's important interests in protecting the safety and economic welfare of its populace, and such a determination is clearly within the state's police power. *See Citizens for an Orderly Energy Policy, Inc. v. County of Suffolk,* 604 F.Supp. at 1098.

The thrust of LILCO's challenges to the various subsections of the LIPA Act is that these provisions will enable the State to circumvent its obligation to fairly compensate LILCO's shareholders when and if LIPA makes a tender offer for LILCO's outstanding stock. Whether LILCO is acquired through a tender offer or through more traditional methods of condemnation, judicial inquiry into the constitutional adequacy of the compensation paid will no doubt occur. The police power does not

extend so far as to allow the state to "permit a public authority to depreciate property values [through its actions] . . . and then to take advantage of this depression in the price which it must pay for the property." *United States v. Virginia Electric Co.,* 365 U.S. 624, 636, 81 S.Ct. 784, 792, 5 L.Ed.2d 838 (1961) (citation omitted); *see also Kohl Industrial Park Co. v. County of Rockland,* 710 F.2d 895, 900 (2d Cir.1983). Nonetheless, the constitutional adequacy of any tender offer must be assessed when made and not before. So long as the court can discern some rational justification for the various provisions of the LIPA Act that LILCO challenges, the utility's facial attack on those provisions under the substantive due process doctrine cannot succeed. LILCO has not demonstrated that any of the challenged provisions of the LIPA Act are so arbitrary that they constitute abuses of the police power of the State of New York, and thus defendants' motion for summary judgment on Count VII of the Complaint is granted.

## E. Equal Protection

LILCO's equal protection challenges to the two statutes at issue here present far more difficult problems for the court. In this court's view, the Supreme Court's equal protection analysis is presently in a state of confusion. The Court's struggle to develop a consistent approach to equal protection issues stands in stark contrast to its handling of substantive due process challenges to legislation that does not impinge upon some fundamental individual right, and a brief overview of the Court's attitude toward due process challenges to economic regulation is instructive in highlighting the contradictions in the Court's equal protection cases.

Since the institutional crisis faced by the federal judiciary in the mid–1930s that culminated in President Roosevelt's proposal to "pack" the Supreme Court in 1937, the federal courts have adhered to "a broad 'hands off' approach" to substantive due process challenges to economic regulation. G. Gunther, *Constitutional Law* 472 (11th ed. 1985). The attitude of the Supreme

Court might have been best summarized by Justice Douglas:

> We deal ... with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation, whether it be Congress legislating concerning the District of Columbia ... or the States legislating concerning local affairs.

*Berman v. Parker*, 348 U.S. 26, 32, 75 S.Ct. 98, 102, 99 L.Ed. 27 (1954) (citations omitted). In essence, the Supreme Court has adopted the view that so long as a state action does not offend fundamental personal rights, the scope of that state's police power extends as far as the legislature determines it should extend. Consequently, when the legislature acts it defines the scope of its police power, and therefore the legislative act necessarily is a legitimate exercise of the police power. The rational basis "analysis" of economic regulation under the due process clause is not really analysis at all but instead a way of articulating a conclusion: if legislation does not affect fundamental personal rights it is a legitimate exercise of the police power. Economic due process unvaryingly means "minimal scrutiny in theory and virtually none in fact." G. Gunther, *supra*, at 472 n. 1 (citation omitted). Since 1937 not one law regulating social or economic matters has been invalidated by the Supreme Court under the rational basis test when utilized in the substantive due process context.

The application of the rational basis test under the equal protection clause differs from its application under the due process clause in that rather than focusing on the legitimacy of an exercise of a state's police power, equal protection jurisprudence examines the propriety of classifications made by legislative and administrative bodies. It has been an unspoken assumption, however, that the nature of the rational basis inquiry under the equal protection clause otherwise tracks the use of the test when challenges to state acts under the substantive due process doctrine are made. *See, e.g., Horizon Concepts, Inc. v. City of Balch Springs*, 789 F.2d 1165, 1167 (5th Cir.1986). The tumultuous history of the rational basis test in equal protection analysis, when compared to the doctrinal tranquility associated with the application of "minimal scrutiny" in the due process context, belies such an assumption.

The equal protection clause directly implicates the fundamental principle that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). The Supreme Court has struggled to give force to this guiding principle while minimizing the danger that the judiciary would chill legislative innovation in dealing with perceived social, political and economic problems. The development of a coherent and consistent doctrinal approach to equal protection jurisprudence has proved elusive.

Between the constitutional revolution of the 1930s until the 1960s, the use of the equal protection clause to strike down legislative acts was fairly limited to cases involving racial discrimination. *See* Gunther, *Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection*, 86 Harv.L. Rev. 1, 8 (1972) (hereinafter *Newer Equal Protection*). During the Warren Court era, the now familiar "two-tier" approach to equal protection analysis, which was foreshadowed in Justice Stone's famous footnote in *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n. 4, 58

S.Ct. 778, 783 n. 4, 82 L.Ed. 1234 (1938),[21] was honed and refined. Under this approach, "suspect" classifications—for example, those discriminating against "discrete and insular minorities" or directly hindering the enjoyment of some "fundamental right"—were subjected to "strict scrutiny." In such cases, the burden was placed on the government to demonstrate that the classification was necessary to serve a compelling state interest. *McLaughlin v. Florida,* 379 U.S. 184, 192, 85 S.Ct. 283, 288, 13 L.Ed.2d 222 (1964). All other classifications were upheld if they were rationally related to valid governmental purposes (the "rational basis" test), and the burden was placed on the party challenging the classification to prove that the classification was not reasonably related to any conceivably legitimate legislative purpose, stated or unstated. *McGowan v. Maryland,* 366 U.S. 420, 425, 81 S.Ct. 1101, 1104, 6 L.Ed.2d 393 (1961); *see also Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 527, 79 S.Ct. 437, 440, 3 L.Ed.2d 480 (1959). As was true of the application of the rational basis test in the substantive due process context, determination that a classification was not "suspect" and thus need only have a "rational basis" was not the beginning but the end of any effective analysis:

> [The equal protection clause] permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.

*McGowan,* 366 U.S. at 425–26, 81 S.Ct. at 1105. The justification for a classification need not be articulated by the legislature itself; after-the-fact rationalizations of statutory classifications by lawyers or judges was not only allowed but encouraged. *See McDonald v. Board of Election,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). The Supreme Court took the view that legislatures must be given wide latitude in drawing lines as a means of remedying perceived social and economic problems. The legislature was allowed to act "one step at a time, addressing itself to the phase of the problem which seem[ed] most acute to the legislative mind"; the states were allowed to "select one phase of one field and apply a remedy there, neglecting the others"; the Court felt that "[t]he prohibition of the [e]qual [p]rotection [c]lause goes no further than the invidious discrimination." *Williamson v. Lee Optical Co.,* 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955).

Until the early 1970s, the application of the rational basis test in the equal protection context paralleled the application of that test under the substantive due process

---

**21.** After observing that "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators," 304 U.S. at 152, 58 S.Ct. at 783, Justice Stone observed in a footnote that

> [t]here may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments, which are deemed equally specific when held to be embraced within the Fourteenth....
>
> It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation....
>
> Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religious ... or national ... or racial minorities[:] [w]hether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.

*Id.* at 152 n. 4, 58 S.Ct. at 783 n. 4 (citations omitted).

doctrine. In only one case between 1937 and 1970 was a legislative action deemed to have failed to satisfy the rational basis standard, and that case was subsequently overruled. *Morey v. Doud*, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), *overruled, New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976). The Warren Court era did see, however, expansive use of the equal protection clause in striking down classifications that burdened judicially-identified fundamental personal rights under the "strict scrutiny" standard of review. Thus, statutes and regulations drawing classifications that impinged on the exercise of the right to vote by the individuals affected by the legislation, *Harper v. Virginia Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966), or the right of affected individuals to travel interstate, *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), were found violative of equal protection. Further, there were indications that the Court might be more willing to find classifications not wholly based on race "suspect." For instance, there were suggestions that classifications based on wealth or illegitimacy warranted closer judicial scrutiny. *See, e.g., Glona v. American Guarantee Co.*, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968) (wrongful death statute distinguishing between legitimate and illegitimate children declared unconstitutional); *Levy v. Louisiana*, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (same); *Harper v. Virginia Board of Elections*, 383 U.S. at 668, 86 S.Ct. at 1082 ("Lines drawn on the basis of wealth or property, like those of race, ... are traditionally disfavored." (citations omitted)). In an early Burger Court decision, a classification drawn on the basis of alienage was subjected to strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). The Court's willingness to give greater constitutional dimension to the value of equality in these cases eventually affected the Court's application of the rational basis test in the 1970s. In the words of Archibald Cox, "[o]nce loosed, the idea of Equality is not easily cabined." Cox, *Forward: Constitu-*

*tional Adjudication and the Promotion of Human Rights*, 80 Harv.L.Rev. 91, 91 (1966).

In the early 1970s, the Supreme Court was confronted with a number of cases involving statutory discriminations which did not seem to warrant strict judicial scrutiny, but nonetheless seemed to offend the notions of fundamental fairness which ultimately inform judicial understanding of the requirements of equal protection. In many of these cases the Court would purport to apply the rationality standard but in fact conducted a more searching inquiry into the legitimacy of the legislative goals underlying the legislative classifications and the means chosen to further those goals. Thus, in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), a provision of a state's probate code giving preference to male applicants over female applicants for appointment as administrators of the estates of the recently deceased was found not to bear a rational relationship to a concededly legitimate state purpose. *Id.* at 76–77, 92 S.Ct. at 254. In *James v. Strange*, 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972), a state statute governing the recoupment of legal defense fees expended by the state for indigent defendants which deprived the indigent defendants of exemptions from wage garnishments available to other civil judgment debtors failed to meet the equal protection clause's requirement of "some rationality." *Id.* at 140, 92 S.Ct. at 2034. In *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), a statute denying death benefits to the class of unacknowledged illegitimate children was struck down under the rational basis test. In *Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the Court found that a subsection of the Food Stamp Act of 1964, 7 U.S.C. § 2011 *et seq.*, which limited receipt of food stamps to households of related individuals while excluding households containing an individual who is unrelated to any other household member, was not rationally related to the stated purpose of the Food Stamp Act, and found that the subsection's "true" purpose of discouraging

hippie communes was illegitimate. In *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), the Court found provisions of the Social Security Act, 42 U.S.C. § 301 *et seq.*, that allowed the spouse of a deceased husband and father to obtain survivors' benefits but denied the same to the spouse of a deceased wife and mother "entirely irrational" and violative of the equal protection clause. 420 U.S. at 651.

These cases demonstrated a greater willingness to examine the relationship of classifications to the concededly legitimate purpose that they were supposed to serve than was evident in cases like *Allied Stores of Ohio* or *Williamson v. Lee Optical*. They have since been explained away as aberrations antedating the development of "middle-tier" or "heightened" scrutiny in the mid–1970s. The Supreme Court expressly adopted this intermediate scrutiny for "quasi-suspect" classifications such as gender in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), in which the Court required the state to demonstrate that such classifications "serve important governmental objectives and [are] substantially related to achievement of those objectives." *Id.* at 197, 97 S.Ct. at 457. As this "middle tier" became more firmly entrenched in equal protection doctrine, the Court moved back toward the extreme deference to legislative line-drawing that characterized the leading Warren Court decisions when statutory classifications were assessed under the rational basis test. *See* Note, *Still Newer Equal Protection: Impermissible Purpose Review in the 1984 Term*, 53 U.Chi.L.Rev. 1454, 1459 (1986).

In the vast majority of the cases in which legislation has been measured against the rational basis standard over the past decade, the Supreme Court has searched for any "conceivable basis" for a legislatively delineated classification. *See, e.g., Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981); *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980). Virtually any governmental purpose has been found

legitimate, and legislation has been upheld even if there is no evidence that the legitimate purpose identified by the Court ever actually motivated the legislature in distinguishing various similarly situated groups, with the Court willing to accept post hoc rationalizations of statutory classifications advanced by state attorneys in support of the challenged legislation. *See Bowen v. Owens*, 476 U.S. 340, 106 S.Ct. 1881, 1887–89, 90 L.Ed.2d 316 (1986) (Marshall, J., dissenting). The Court has validated classifications that are under-inclusive, *see Califano v. Jobst*, 434 U.S. 47, 57–58, 98 S.Ct. 95, 101, 54 L.Ed.2d 228 (1977), classifications that are over-inclusive, or even classifications that are both under- and over-inclusive. *See, e.g., Vance v. Bradley*, 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979). The Court has upheld legislative classifications even in cases where there is no actual causal relationship between ends and means (the classification) so long as the legislature *"rationally could have believed* that the [means chosen] would promote its objective." *Western & Southern Life Ins. Co. v. Bd. of Equalization*, 451 U.S. 648, 672, 101 S.Ct. 2070, 2085, 68 L.Ed.2d 514 (1981) (emphasis in original); *Minnesota v. Clover Leaf Creamery*, 449 U.S. at 466, 101 S.Ct. at 725. The Court has repeatedly stated that it is permissible for legislatures to treat similarly situated individuals differently as "first steps" toward solving a perceived problem, *Califano v. Jobst*, 434 U.S. at 57–58, 98 S.Ct. at 101, and even when challenged legislation is drafted in such a way that its impact is felt by only a single individual, corporation, or identifiable group which is fairly indistinguishable from those not affected by the legislation, equal protection violations have not been found. *See Nixon v. Administrator of General Services*, 433 U.S. at 471, n. 33, 97 S.Ct. at 2804, n. 33.

This retreat from meaningful scrutiny of legislation under the rational basis test was made less troublesome by the development of the "intermediate" scrutiny standard, which allowed the Court to make a more searching inquiry into the relationship of ends and means in cases challenging legis-

lative classifications that would not warrant strict scrutiny but in which the Court might otherwise loathe to apply a toothless rationality test. However, the evolution of the intermediate standard of review has created problems of its own, and individual Justices (particularly Chief Justice Rehnquist) and scholars have increasingly criticized its use. *See, e.g., Craig v. Boren,* 429 U.S. 190, 221, 97 S.Ct. 451, 469, 50 L.Ed.2d 397 (1976) (Rehnquist, J., dissenting); Seeburger, *The Muddle of the Middle Tier: The Coming Crisis in Equal Protection,* 48 Mo.L.Rev. 587, 615 (1983) ("The differing positions of the various blocs [on the Supreme Court] suggests that an intermediate level of scrutiny as a judicial test imposes no check on policy preferences."); Hull, *Sex Discrimination and the Equal Protection Clause: An Analysis of* Kahn v. Shevin *and* Orr v. Orr, 30 Syracuse L.Rev. 639, 671 (1979) ("[T]he middle tier has no predictable application. Whether or not a given classification furthers an 'important governmental interest,' or is 'substantially related' to this interest, are subjective determinations."). The Court has had difficulty determining what characteristics distinguish "suspect" and "quasi-suspect" classes from classes that are not suspect, *compare City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 442–46, 105 S.Ct. 3249, 3255–58, 87 L.Ed.2d 313 (1985), *with* 473 U.S. at 460–65, 105 S.Ct. at 3265–68 (Marshall, J., concurring in part and dissenting in part) (Court divided over whether mentally retarded individuals constitute quasi-suspect class), and has shown reluctance to extend "middle tier" scrutiny to groups who have suffered some societal disadvantages in the past. *See id.* at 445–46, 105 S.Ct. at 3257–58 ("[I]f the large and amorphous class of the mentally retarded were deemed quasi-suspect ..., it would be difficult to find a principled way to distinguish a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large.... We are reluctant to set out on that course....").

This reluctance to extend the protections of intermediate scrutiny to groups who have suffered some historical political disadvantage has paralleled a similar reluctance to identify "fundamental rights" that trigger intensified judicial scrutiny of legislative classifications under equal protection analysis. One result of these developments has been a second wave of cases utilizing rational basis rhetoric but employing noticeably greater scrutiny than was evident in cases like *Williamson v. Lee Optical* or *Minnesota v. Clover Leaf Creamery.* When confronted with difficult cases involving classes that have suffered some societal prejudice or have been denied rights that verge on the "fundamental," the Court has recently employed the rational basis test to invalidate state laws.

The precursor of this second wave of cases was *Zobel v. Williams,* 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). In *Zobel,* the Court applied the rational basis test to invalidate a statutory scheme through which a state distributed moneys earned from its mineral resources to citizens in varying amounts depending on the length of each citizen's residence in the state. The Court found that two of the three purposes the state claimed the distribution scheme served—to provide a financial incentive for individuals to establish and maintain residence in the state, and to encourage prudent management of the Fund that was established from the income derived from the state's mineral resources—were not rationally related to the distinction drawn between newer residents and more established residents. *Id.* at 61–63, 102 S.Ct. at 2313–14. The court declared a third purpose advanced by the state in justification of the distinctions made by the distribution scheme—the apportionment of benefits in a manner designed to award citizens for undefined past contributions to the state—to be illegitimate. *Id.* at 63–64, 102 S.Ct. at 2314.

In the same term, the Supreme Court struck down a state statute mandating that funds for the education of illegal alien children be withheld from local school districts and authorizing the school districts to deny

enrollment to such children. *Plyler v. Doe,* 457 U.S. 202, 230, 102 S.Ct. 2382, 2401, 72 L.Ed.2d 786 (1982). Though finding that undocumented resident aliens were not a "suspect class" and that education was not a "fundamental right," the majority found that the undocumented status of the children affected by the statute did not "establish[ ] a sufficient rational basis for denying them benefits ... afford[ed] other residents," *id.* at 224, 102 S.Ct. at 2398, and thus the statute violated the equal protection clause. The Court declared that none of the three colorably legitimate purposes offered by the state's attorneys in support of the classification—protection of the state from the influx of illegal immigrants, the state's interest in preventing resources invested in education from being drained by the special burdens imposed by educating undocumented children, and the state's purported interest in a productive social and political "return" on funds invested in educating the young—were not measurably furthered by the distinctions drawn by the statute. *Id.* at 227–30, 102 S.Ct. at 2400–01.

In 1985, the court on four separate occasions invalidated state laws by applying the most deferential level of scrutiny under equal protection jurisprudence. The first of these cases, *Metropolitan Life Ins. Co. v. Ward,* 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), involved an Alabama statute which gave domestic insurance companies preferential tax treatment over insurance companies based out of state.[22] The state claimed that the statute encouraged the formation of new insurance companies in Alabama as well as capital investment by foreign insurance companies in certain specified Alabama assets and governmental securities. The Court found these two purposes illegitimate, at least "when furthered by discrimination." *Id.* at 882, 105 S.Ct. at 1684.

In *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985), the Court invalidated a complex vehicle use tax scheme that gave automobile purchasers a credit for any sales or use tax paid in another state. However, only those purchasers who were residents of the state at the time of purchase and initial registration benefited from the credit; individuals who purchased and registered their automobiles out-of-state and later became residents of Vermont were not given the same credit. The Court found that this "discriminatory exemption" furthered "no legitimate purpose." *Id.* at 23, 105 S.Ct. at 2472. In the majority's view, the distinction drawn on the basis of residence at time of purchase was not rationally related to any of a number of possible justifications for a use tax. For example, the classification did not serve as a disincentive for residents who might attempt to avoid state taxes and surcharges by going out of state to purchase automobiles. *Id.* at 24–25, 105 S.Ct. at 2472–73. Further, the Court found that "the principle that those using the roads should pay for them" was not furthered by a policy which effectively imposed a use tax on residents who bought their automobiles before they moved to Vermont but not on residents who lived in Vermont when they purchased their cars. *Id.* at 25–26, 105 S.Ct. at 2473–74. The Court rejected arguments that the classification somehow encouraged out-of-staters to purchase their vehicles in Vermont or, conversely, encouraged interstate commerce by enabling Vermont residents to shop out of state without incurring an additional tax. *Id.* at 26–27, 105 S.Ct. at 2473–74.

In *Hooper v. Bernalillo County Assessor,* 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985), another statute favoring "established" residents over newer ones was invalidated. The Court found that the statute, which gave a property tax exemption to Vietnam veterans who estab-

---

**22.** Such discriminatory taxes ordinarily are examined under either the privileges and immunities clauses of the Constitution, *see* U.S. Const. art IV, § 2, cl. 1; U.S. Const. amend. 14, § 1, or under the commerce clause. U.S. Const. art. I, § 8, cl. 3. However, because the plaintiffs in *Ward* were corporations and thus not "citizens" protected by the privileges and immunities clauses, and because Congress explicitly exempted state taxation of insurance companies from "dormant" commerce clause restraints in the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015, the Alabama statute was challenged only on equal protection grounds.

lished residence in the State of New Mexico before May 8, 1976, did not further a policy of encouraging veterans to settle in the state since new residents would not benefit from the tax exemption, *id.* at 619–20, 105 S.Ct. at 2866, and that although compensation of veterans for past service to country was a legitimate state interest, favoring "'established' resident veterans" from veterans who became New Mexico residents after May 8, 1976 was not a permissible means to further that legitimate state interest. *Id.* at 620–22, 105 S.Ct. at 2867–68.

Finally, in *City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Court invalidated a zoning ordinance which required a special use permit in residential areas for "[h]ospitals for the insane or feeble-minded, or alcoholic[s] or drug addicts, or penal or correctional institutions." *See id.* at 436 & n. 3, 105 S.Ct. at 3253 & n. 3. The ordinance was challenged by an institution housing mentally retarded individuals. The Court expressly found that mental retardation was not a suspect or quasi-suspect classification, *id.* at 442–47, 105 S.Ct. at 3255–58, but that the ordinance at issue nonetheless violated the equal protection rights of the mentally retarded. Examining the ordinance under the rational basis test, the Court systematically dismissed asserted purposes justifying the ordinance as either impermissible or not rationally furthered by the requirement for the special use permit. The Court found that the "negative attitude of the majority of property owners" toward institutions for the mentally retarded and "fears of elderly residents" living near the institution, without more, were not permissible bases for treating such institutions differently than apartment houses, multiple dwellings, or the like. *Id.* at 448, 105 S.Ct. at 3259. Other justifications offered in support of the ordinance included concerns about the location of such an institution on a flood plain, potential liability arising out of the conduct of the mentally retarded, the size of the institution and the number of residents it would hold, street congestion, fire hazards, and neighborhood serenity. While recognizing the legitimacy of such concerns, the Court found no rational relationship between them and the decision to treat institutions housing mentally retarded individuals differently from other institutions— such as nursing homes, homes for the aged, fraternity houses, and college dormitories—that could occupy the same property without obtaining a permit. *Id.* at 449– 50, 105 S.Ct. at 3259–60. In essence, the court found that the classification drawn by the legislature was unconstitutionally under-inclusive.

In a separate concurrence, Justice Marshall noted that "the rational basis test invoked [in *Cleburne*] is most assuredly not the rational basis test of *Williamson v. Lee Optical* ... and [its] progeny." *Id.* at 458, 105 S.Ct. at 3264 (Marshall, J., concurring in part and dissenting in part). Justice Marshall highlighted some of the differences between the approach to rationality analysis in *Cleburne* and that used in the vast majority of cases in which the Court has applied the rational basis test in the past three decades:

> The Court, for example, concludes that legitimate concerns for fire hazards or the serenity of the neighborhood do not justify singling out respondents to bear the burdens of these concerns, for analogous permitted uses appear to pose similar threats. Yet under the traditional and most minimal version of the rational-basis test, "reform may take one step at time, addressing itself to the phase of the problem which seems most acute to the legislative mind" [quoting *Williamson v. Lee Optical,* 348 U.S. at 489, 75 S.Ct. at 465].... The "record" is said not to support the ordinance's classification, ... but under the traditional standard we do not sift through the record to determine whether policy decisions are squarely supported by a firm factual foundation.... Finally, the Court further finds it "difficult to believe" that the retarded present different or special hazards than other groups. In normal circumstances, the burden is not on the legislature to convince the Court that the lines it has drawn are sensible; legislation is presumptively constitutional, and

a state "is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference" to its goals.

*Id.* at 458–59, 105 S.Ct. at 3264–65 (Marshall, J., concurring in part and dissenting in part) (citations omitted).

In each of the recent cases outlined above, the Court has exhibited a "willingness to penetrate the asserted justifications [for legislative acts] and to scrutinize more carefully the congruence between legislative ends and legislative means." *Phan v. Virginia,* 806 F.2d 516, 621 n. 6 (4th Cir. 1986). The significance of these cases to the application of the rational basis standard in equal protection challenges to purely social and economic legislation, however, is unclear.[23] The Supreme Court's occasional departures from the extreme deference of Warren Court-style rational basis analysis, both in the early 1970s and in this second wave of cases in recent years, have been limited to cases involving classifications that infringed on rights that are "almost" fundamental or singled out classes that are "almost" suspect. *See* Note, *Justice Stevens' Equal Protection Jurisprudence,* 100 Harv.L.Rev. 1146, 1150–51 (1987); Note, *Still Newer Equal Protection: Impermissible Purpose Review in the 1984 Term,* 53 U.Chi.L.Rev. 1454, 1474–81 (1986). For instance, in *Cleburne* and *Plyler v. Doe,* as in earlier cases such as *Weinberger v. Wiesenfeld* and *Moreno,* groups who have suffered some degree of societal disfavor were discriminated against in the classification drawn. Cases such as *Zobel, Williams,* and *Hooper* implicated the right of free interstate migration, a right which was subsequently deemed fundamental for equal protection purposes in *Attorney General v. Soto-Lopez,* 476 U.S. 898, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986). Nonetheless, this court believes that the difficulty the Supreme Court has had in applying the rational basis test in a consistent manner in equal protection cases, particularly when contrasted to the uneventful history of the same standard in the substantive due process context, reveals deeper concerns that go to the nature of the values protected by the equal protection clause itself. These concerns are just as relevant to economic classifications as they are to the classifications found objectionable in *Cleburne* and *Williams.*

Challenges to the police power of the states under the substantive due process doctrine are founded on the proposition that there are certain matters that should be immune from governmental interference. At one time in this nation's history, it was widely felt that among those areas largely outside a state's police power were the regulation of the workplace and the general conduct of an individual's or corporation's business affairs. The Supreme Court reflected this conception of the limits to the states' police power in a series of decisions which, when viewed from the perspective of modern conceptions of the appropriate role of government in economic affairs, seem anachronistic. *See, e.g.,*

---

**23.** Recent lower court decisions have split on the proper degree of scrutiny to be given legislation in light of *Cleburne, Ward, Hooper* and *Williams.* The vast majority of cases have adhered to the *Williamson v. Lee Optical* approach of no meaningful scrutiny of legislative classifications that do not infringe on the exercise of some fundamental right by members of the affected group nor discriminate against suspect or quasi-suspect classes. *See, e.g., Jackson Water Works, Inc. v. Public Utilities Comm'n,* 793 F.2d 1090 (9th Cir.1986); *Shelton v. City of College Station,* 780 F.2d 475 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986); *Edwards v. Valdez,* 789 F.2d 1477, 1482–84 (10th Cir.1986). Others, however, have applied the rational basis formula to strike down legislation. *See, e.g., Deibler v. City of Rehoboth Beach,* 790 F.2d 328 (3d Cir.1986) (requirement

that candidate for elective office be nondelinquent in payment of taxes not rationally related to any legitimate governmental interest); *Christian Science Reading Room Jointly Maintained v. City of San Francisco,* 784 F.2d 1010 (9th Cir.1986) (airport policy of not renting space to any religious organizations, reversing prior policy of renting space to such organizations, not rationally related to purpose of remedying perceived violations of first amendment establishment clause caused by prior policy since prior policy did not violate establishment clause); *Faheem-El v. Klincar,* 620 F.Supp. 1308 (N.D.Ill. 1985) (practice of granting bail to probationers accused of subsequent crime while denying bail to parolees accused of subsequent crime bore no rational relationship to legitimate state purpose).

*Williams v. Standard Oil Co.*, 278 U.S. 235, 239, 49 S.Ct. 115, 116, 73 L.Ed. 287 (1929) (state statute regulating price of gasoline invalidated, with Court maintaining that "[i]t is settled by recent decisions ... that a state legislature is without constitutional power to fix prices at which commodities may be sold, services rendered, or property used, unless the business or property involved is 'affected with a public interest.' "); *Adkins v. Children's Hospital*, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923) (District of Columbia law establishing a minimum hourly wage for women struck down); *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (New York law prohibiting employment of bakery employees for more than ten hours a day or sixty hours a week deemed "unreasonable and entirely arbitrary."). These cases are now discredited, largely because the inflexible *laissez faire* assumptions they embodied are no longer shared by most Americans. It is now generally accepted that legislatures should be given wide latitude in addressing social and economic problems, and that the judiciary should not impede the ability of the policymaking branches to regulate the marketplace. With the rejection of the idea that certain matters of chiefly economic concern are beyond the states' regulatory power, the substantive due process doctrine ceased to pose any serious threat to legislation affecting only the economic rights of individuals and corporations.

Attacks on legislation under the equal protection clause are qualitatively different from substantive due process challenges to state actions because they implicate values that are still deeply ingrained in "the 'traditions and [collective] conscience of our people.' " *Griswold v. Connecticut*, 381 U.S. 479, 493, 85 S.Ct. 1678, 1686, 14 L.Ed.2d 510 (1965) (Goldberg, J., concurring) (citation omitted). Although the power of the state to act in response to perceived necessity may no longer be questioned, the principle that in exercising its power the government should treat its citizens fairly is still a cornerstone to our conceptualization of the limits the Constitution places on the democratic branches. While it is true that "[c]lassification is the essence of all legislation," *Clements v. Fashing*, 457 U.S. 957, 967, 102 S.Ct. 2836, 2845, 73 L.Ed.2d 508 (1982), and although legislatures should be free to develop innovative responses to particular problems, when those legislative responses *unfairly* burden one of several like-situated individuals or groups, fundamental notions of justice and equality are offended. This court believes that the dichotomy between the Supreme Court's application of the rational basis test in the due process context and the inconsistent application the Court has made of the rational basis test in its equal protection jurisprudence is in part the result of the fact that the equal protection clause must give concrete meaning to the fundamental societal value of equality, while the economic substantive due process doctrine no longer has any independent value content. Moreover, the concept that people who are alike should be treated alike does not lose its vitality when purely economic legislation is enacted. Thus, the application of the content-barren "rational basis" standard utilized in due process jurisprudence seems inappropriate when legislation is challenged under the equal protection clause.[24]

As early as 1949 Justice Jackson advocated more searching judicial inquiry when legislation was challenged under the equal protection clause than would be appropri-

**24.** The idea that standards that have been articulated in substantially identical language can have differing substantive application in different contexts has been implicitly recognized by the Supreme Court in another context: "[T]here is no reason to believe (and the language of our cases gives some reason to disbelieve) that so long as the regulation of property is at issue the standards for takings challenges, due process challenges, and equal protection challenges are identical; any more than there is any reason to believe that so long as the regulation of speech is at issue the standards for due process challenges, equal protection challenges, and [f]irst [a]mendment challenges are identical." *Nollan v. California Coastal Comm'n*, —— U.S. ——, —— n. 3, 107 S.Ct. 3141, 3147 n. 3, 97 L.Ed.2d 677 (1987) (discussing test to be applied to determine when land use regulation constitutes a "taking" within meaning of fifth amendment.)

ate when due process challenges were made:

There are two clauses of the Fourteenth Amendment which this Court may invoke to invalidate ordinances by which municipal governments seek to solve their local problems. One says that no state shall "deprive any person of life, liberty, or property, without due process of law." The other declares that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

My philosophy as to the relative readiness with which we should resort to these two clauses is almost diametrically opposed to the philosophy which prevails on this Court. While claims of denial of equal protection are frequently asserted, they are rarely sustained. But the Court frequently uses the due process clause to strike down measures taken by municipalities to deal with activities in their streets and public places which the local authorities consider as creating hazards, annoyances or discomforts to their inhabitants. And I have frequently dissented when I thought local power was improperly denied....

The burden should rest heavily upon one who would persuade us to use the due process clause to strike down a substantive law or ordinance. Even its provident use against municipal regulations frequently disables all government—state, municipal and federal—from dealing with the conduct in question because the requirement of due process is also applicable to State and Federal Governments. Invalidation of a statute or an ordinance on due process grounds leaves ungoverned and ungovernable conduct which many people find objectionable.

Invocation of the equal protection clause, on the other hand, does not disable any governmental body from dealing with the subject at hand. It merely means that the prohibition or regulation must have a broader impact. I regard it as a salutary doctrine that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation. This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

*Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 111–13, 69 S.Ct. 463, 466–67, 93 L.Ed. 533 (1949) (Jackson, J., concurring) (citations omitted). Professor Gerald Gunther has used Justice Jackson's observations as a starting point in developing "means-oriented" model for judicial scrutiny under equal protection rubric of legislative acts that do not impinge upon fundamental personal rights or disadvantage suspect groups but nonetheless implicate the values associated with the equal protection concept. Under Gunther's model, the courts would continue to accept the legitimacy of any legislative purpose offered in justification of particular statutory classifications (so long as the purpose is something other than naked discrimination, and so long as the purpose does not offend specific prohibitions in the Constitution), but would be more willing to meaningfully examine the relationship between the classification drawn and the end the classification is to serve. *See*, Gunther, *Newer Equal Protection*, 86 Harv.L.Rev. at 20–48. Gunther argues that by focusing on the congruence of legislative means and ends rather than on the legitimacy of the ends themselves, courts can give practical dimension to the value of equality without creating absolute barriers to the accom-

plishment of any purpose the representative branches deems desirable. Gunther argues that such an approach is firmly rooted in constitutional history: before the Warren Court era, "equal protection was always means-oriented; unlike due process, it had no added substantive dimension focusing on the legitimacy of ends." *Id.* at 43 (citing Tussman & tenBroek, *The Equal Protection of the Laws*, 37 Calif.L.Rev. 341 (1949)). The standard applied would be a familiar one: the courts would make "a modest but real inquiry to determine whether 'the means selected [the classifications drawn] ... have a real and substantial relation to the object sought to be attained.' " *Id.* at 42 (quoting *Nebbia v. New York*, 291 U.S. 502, 525, 54 S.Ct. 505, 511, 78 L.Ed. 940 (1934)). In essence, Gunther's approach to rational basis scrutiny of social and economic legislation under the equal protection clause "represents no innovation in theory; it asks a change in practice, to bring the actual exercise of judicial scrutiny into line with the frequently reiterated rationality mandate." *Id.* at 43.

Though never expressly embracing Gunther's model, it appears that the Supreme Court has from time to time applied it. In *Cleburne,* for example, the Court, while conceding the legitimacy of most of the purposes the state claimed were furthered by the challenged ordinance, demanded some plausible connection between those ends and the burdens placed on those who were singled out by the ordinance. 473 U.S. at 449–50, 105 S.Ct. at 3259–60. The same was true in *Hooper.* 472 U.S. at 620–22, 105 S.Ct. at 2867–68. In *Williams v. Vermont,* the Court identified a number of legitimate purposes that could be served by a use tax, but rejected the unequal application of such a tax without some plausible justification for the difference in the burdens the tax scheme posed on individuals who were not distinguishable in any relevant manner. 472 U.S. 24–27, 105 S.Ct. at 2472–74. Although the Court has also recently exhibited a willingness to scrutinize the legitimacy of legislative ends as well as the connection between those ends and the classifications made by the legislature, *see Ward,* 470 U.S. at 882, 105 S.Ct. at 1684, such a tendency resurrects many of the institutional concerns that fueled the Court's retreat from meaningful scrutiny of economic legislation under the due process clause in the late 1930s. As noted by Justice Jackson, by limiting scrutiny to the rationality of means rather than the legitimacy of legislative ends, the courts can accommodate the values underlying the equal protection clause without disabling legislatures "from dealing with the subject at hand." *Railway Express,* 336 U.S. at 112, 69 S.Ct. at 466 (Jackson, J., concurring).

The foregoing discussion of the evolution of equal protection doctrine and theory is not merely an academic exercise; the outcome of LILCO's equal protection claims turns on whether or not it is appropriate to subject the challenged acts to meaningful rationality scrutiny. The application of the rational basis test applied in *Williamson v. Lee Optical* and its progeny to the legislation in question would yield a different result than would the application of the approach utilized in *Cleburne.* It is doubtful that any statute having merely an economic impact on individuals or groups that have not been subjected historically to societal discrimination could be struck down under the *Williamson* approach. To require a plaintiff to hypothesize all conceivable justifications for a statutory classification and then prove that no legislative body could "rationally have believed" that the classification served the hypothesized purpose, *Western & Southern Life Ins. v. State Bd. of Equalization,* 451 U.S. at 672, 101 S.Ct. at 2085, and then to require judges to use their imaginations in postulating unarticulated purposes which the legislature might have believed the legislation served, *McDonald v. Board of Election,* 394 U.S. at 809, 89 S.Ct. at 1408, is to impose what in practice are insurmountable barriers to any equal protection claim. *See, e.g., Minnesota v. Clover Leaf Creamery,* 449 U.S. 456, 101 S.Ct. 715, 66 L.Ed.2d 659 (statute banning sale of milk in nonreturnable, nonrefillable plastic containers but permitting sale of milk in nonreturna-

ble, nonrefillable paperboard milk cartons found rationally related to state's interest in conservation and manageable waste disposal even though paperboard cartons were more environmentally hazardous and presented greater disposal problems, and even though evidence before trial court indicated that actual purpose of statute was promotion of certain local dairy and pulpwood industries at the expense of other segments of the dairy industry and the plastics industry). It has been forcefully argued that the courts should not subject the acts of the representative branches of government to any sort of rationality analysis whatsoever, since such an analysis overlooks the realities of a political process in which legislation is the result of compromise and the power struggles of various interest groups rather than some emperical determination of the most appropriate means to accomplish some end. *See* Posner, *The* DeFunis *Case and the Constitutionality of Preferential Treatment of Racial Minorities,* 1974 S.Ct.Rev. 1, 26, 31; *see also* Perry, *Modern Equal Protection: A Conceptualization and Appraisal,* 79 Colum.L.Rev. 1023, 1067–74 (1979). Whatever the merits of such an argument, if the courts are going to adopt the view that meaningful scrutiny of economic legislation under the equal protection clause is inappropriate, we should simply come out and say so. On the other hand, if the courts are going to hold the acts of legislatures to a rationality standard, judges should not become rubber-stamps giving legitimacy to statutes which offend common notions of fairness simply because "mere" economic interests are involved. This court proceeds on the theory that the values underlying the equal protection clause do not become empty platitudes even when legislative action affects purely economic interests and groups that have not been subjected to past societal discrimination.

In addressing equal protection challenges to statutory classifications, the courts must recognize that such classifications must be "allowed some play in the joints," *Williams v. Vermont,* 472 U.S. at 23 n. 8, 105 S.Ct. at 2472 n. 8, and that legislation is necessarily the result of compromise which usually yields less than perfect distinctions and categorizations. Nonetheless, legislatures have a "duty to govern impartially," *Cleburne,* 473 U.S. at 452, 105 S.Ct. at 3261 (Stevens, J., concurring), and it is appropriate that the courts make some inquiry into whether "an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." *Id.* (Stevens, J., concurring) (footnote omitted). It is appropriate that in making this inquiry, the courts should make a more searching rational basis analysis under the equal protection clause than would be made if the legislation at issue was challenged only under the substantive due process doctrine. Although both constitutional provisions require an examination of the relationship between ends and means, it can safely be assumed that if the legislature errs in matching means with ends and its error affects everyone equally, the normal operation of the political process will in time correct the mistake. Cf. *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. If the error only affects a minority singled out by the legislature, however, it is far less certain that the democratic process will remedy possible injustices, particularly when an unpopular minority is affected. It seems that an implicit recognition of this political reality has in part motivated the Court when it has strayed from the extreme deference of *Williamson v. Lee Optical.*

In light of the foregoing considerations, it does not seem that the courts would unduly hinder the political branches by placing the initial burden of articulating a legitimate governmental interest served by a challenged classification on the party defending the classification. In other words, judges should not strain their imaginations "to conceive of possible rational justifications in order to save ... statutory classification[s]." *See Schlesinger v. Ballard,* 419 U.S. 498, 520, 95 S.Ct. 572, 584, 42 L.Ed.2d 610 (Brennan, J., dissenting). Such a practice places an insuperable barrier to individuals and groups whom the state has determined must suffer disadvan-

tages from which the rest of society is spared or should be denied benefits enjoyed by others and who wish to attack the rationality of the legislature's decision to single them out. Moreover, the courts should limit their inquiry to the legislature's stated purposes when these purposes can be easily discerned from the statute itself or its legislative history. *Johnson v. Robison*, 415 U.S. 361, 376, 94 S.Ct. 1160, 1170, 39 L.Ed.2d 389 (1974). So long as the purpose articulated does not offend specific constitutional prohibitions and consists of something more than a blatant desire to discriminate, the presumption that the purpose offered in justification for a classification is legitimate should be considered "well-nigh conclusive." *See Berman v. Parker*, 348 U.S. at 32, 75 S.Ct. at 102. Once the governmental purpose or purposes underlying a statutory classification have been articulated, the burden should shift to the party attacking the legislation to show that the relationship between the classfication and the articulated purpose is "so attenuated as to render the distinction arbitrary or irrational," *Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3258, or that the articulated purpose "could not have been a goal of the legislation." *Weinberger v. Wiesenfeld*, 420 U.S. at 648 n. 16, 95 S.Ct. at 1233 n. 16.

Applying these principles to the case at bar, the court finds that the Used and Useful Act violates the equal protection clause of the Constitution. The new subdivision 24 of § 66 of the Public Service Law applies only to privately owned utilities which are the sole owners of a nuclear power plant not commercially used and useful on that subdivision's effective date. N.Y.Pub.Serv.Law § 66(24)(a). As noted above, only LILCO falls within this definition. Although three other private utilities (as well as the publicly-owned New York

State Power Authority) are sole owners of nuclear reactors, all of these plants were in commercial use at the time the Used and Useful Act became law. Although other utilities are part-owners of a nuclear power plant (Nine Mile Point II) that was not in commercial use when the Used and Useful Act was passed, those utilities were unaffected by the terms of that statute. While the Used and Useful Act would in theory apply to private utilities who in the future become sole owners of nuclear reactors, in all practical likelihood utilities will strive to avoid the terms of the Act by limiting themselves to joint projects like Nine Mile Point II. A single utility could be a 99% owner of a reactor, with another utility controlling the other one percent, and fall outside the coverage of the Used and Useful Act. In short, the Used and Useful Act draws a statutory classfication distinguishing LILCO from all other private utilities operating in the State of New York. To successfully challenge this classification under the equal protection clause, LILCO must demonstrate that it is not rationally related to any legitimate purpose the state has articulated in support of the Used and Useful Act.

The Used and Useful Act precludes the PSC from including in LILCO's revenue requirement any costs directly or indirectly attributable to the Shoreham project if LILCO does not obtain a full-power operating license from the NRC before January 3, 1989,[25] and further requires the PSC to exclude Shoreham-related costs from LILCO's rate base should the plant cease operation after having become commercially used and useful in the actual generation of electricity. N.Y.Pub.Serv.Law § 66(24)(a), (d). According to the declaration of legislative purpose which was adopted by the New York Legislature when it passed the Act,[26] the Act was de-

---

**25.** January 3, 1989 appears to be the latest date upon which the terms of the Used and Useful Act would become effective. It is possible that the Act could go into effect at an earlier date. *See supra* note 1.

**26.** The legislative findings and declaration supporting the Used and Useful Act were as follows:

The legislature hereby finds and declares that, pursuant to traditional regulatory principles, utility customers should not be required to bear the cost of a plant which fails to operate; that investment in such a plant would be of no benefit to the utility's customers, for the plant would not constitute property used and useful in the provision of the utility's service;

signed to assure that utility customers do not bear the staggering costs associated with a nuclear power plant that fails to commence or continue commercial operation by requiring the PSC to apply traditional used and useful rate-setting principles. Act of July 24, 1986, ch. 518, § 1 of the laws of 1986 (McKinney's Session Laws). The court does not question the legitimacy of this purpose. The classification drawn in an effort to further this purpose, however, is so under-inclusive that it must be deemed irrational.

While it may be true that "the financial consequences of a utility's expenditure of vast sums on a nuclear power plant that fails to operate is of particular public concern because of the large amounts involved," *id.*, it is difficult to see how the financial repercussions of an investment by a single utility of "vast sums" in a joint venture with other utilities to build a nuclear reactor are any less significant to the state's economic well-being than is an investment by a single utility of "vast sums" in a plant which it owns by itself. While it may be a sound regulatory practice to prevent further recovery of the costs associated with the construction of a nuclear power plant once that plant, having commenced commercial operation, ceases operation, the court fails to see how this principle is fairly implemented when LILCO would be pre-vented from recovering such costs if Shoreham becomes operational but at some time in the future is abandoned, while Consolidated Edison would not similarly be prevented from further recovering the costs associated with the Indian Point II reactor should that plant ever be abandoned before fully recovering the costs associated with it.

The legislature found that "special circumstances" surrounding the construction of Shoreham, including "the extraordinary size of the investment [in Shoreham], the prolonged, continuing and fundamental inability of [LILCO] to obtain a full power operating license [for Shoreham], and the concentration of economic burden on the ratepaying residents and businesses on Long Island if [Shoreham] fails to commence or continue commercial operation," justified the application of the used and useful principle only to LILCO, since "such special circumstances are not now present and are not anticipated to occur in connection with other nuclear power plants" in New York. *Id.* Essentially, the State seems to argue that since at present it appears that only Shoreham will fail to recover its costs through the generation of electricity, it is proper to single out LILCO in mandating the application of used and useful principles in determining the utili-

that the financial consequences of a utility's expenditure of vast sums on a nuclear power plant that fails to operate is of particular public concern because of the large amounts involved; that it would pose an unreasonable and discriminatory detriment to the customers of such a utility and to economic activity in such utility's service territory to permit any of the costs of such plant to be borne by such customers or to burden such economic activity; that this financial detriment to such customers is intensified when the costs of such plant must be shared among a smaller number of ratepayers; that it is just and and [sic] reasonable in these circumstances that the consequences of the business judgment to expend vast sums on a nuclear power plant that fails to operate fall on the company that made that judgment and not on its customers, particularly where such customers have no legal opportunity to obtain utility services elsewhere; and that it is in the public interest to protect utility customers, to the greatest extent permitted by the constitutions of the United States and the state of New York, from having to bear, directly or indirectly, any of the costs associated with such a plant.

The legislature further finds and declares that special circumstances surrounding the construction by a single electric or gas and electric corporation of a nuclear power plant which may fail to operate on Long Island require a specific statutory prescription of the application of the used and useful principle in that instance, that these unique circumstances include the extraordinary size of the investment in such plant, the prolonged, continuing and fundamental inability of the utility to obtain a full power operating license for such plant, and the concentration of economic burden on the ratepaying residents and businesses on Long Island if such plant fails to commence or continue commercial operation; and that such special circumstances are not now present and are not anticipated to occur in connection with other nuclear power plants in the state.

Act of July 24, 1986, ch. 518, § 1 of the laws of 1986 (McKinney's Session Laws).

ty's revenue requirement. The fact that the terms of a statute, if drafted in such a way that it applied to all like-situated individuals, would in the legislature's estimation actually affect only one of those individuals does not justify drafting the statute in such a way that it applies only to that individual and not to the others who are similarly situated. This is akin to a small community, believing that one particular individual is prone to steal automobiles, passing an ordinance prohibiting that individual from stealing automobiles but not imposing a similar prohibition on all others in the community. Clearly, such an ordinance would offend the "element of neutrality that must always characterize the performance of the sovereign's duty to govern impartially." *Cleburne*, 473 U.S. at 452, 105 S.Ct. at 3261 (Stevens, J., concurring) (footnote omitted).[27] Although legislative classifications need not be made with "mathematical nicety," the choice of criterion on which the application of the terms of a statute is based "cannot be so casual as this, particularly when a more precise and direct classification is easily drawn." *Williams v. Vermont*, 472 U.S. at 23 n. 8, 105 S.Ct. at 2472 n. 8.

In February 1986 the New York Assembly passed a bill that would have applied the used and useful rate-setting principle to all private utilities operating in New York that have invested in nuclear power plants. Assembly Bill No. 6891 (introduced March 25, 1985) (Doc. 17, TAB 1). That version of the bill did not win support in the Senate, but a used and useful proposal applicable to nuclear reactors "owned by a single electric or gas and electric corporation" was passed. Senate Bill No. 6411A (introduced June 6, 1985) (Doc. 17, TAB 3). On June 16, 1986 Governor Cuomo proposed a used and useful law applying to nuclear power plants that fail to "commence or continue commercial operation." *See supra* note 3. Again, Senate approval for

such a bill could not be obtained. Ten days later, the used and useful bill that was finally signed into law was introduced, and its terms applied exclusively to LILCO. To allow the Used and Useful Act to stand would "invite legislatures to avoid the full political consequences of their actions, for 'nothing opens the door to arbitrary action so effectively as to allow ... officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected.'" L. Tribe, *American Constitutional Law* 998 (1978) (quoting *Railway Express Agency, Inc. v. New York*, 336 U.S. at 116, 69 S.Ct. at 468 (Jackson, J., concurring)). Invalidating the Used and Useful Act, on the other hand, would not prevent the legislature from achieving its purported end; it would only require the state to act in conformity with fundamental notions of fairness and equality when it pursues its stated purpose.

Finally, the court simply cannot ignore the relationship between the Used and Useful Act and the LIPA Act. Two days before the version of the Used and Useful Act that was finally adopted was proposed by Governor Cuomo, the Sawhill Report was published. That report noted that "if [LILCO's] shareholders believe that there is a reasonable probability that Shoreham will not operate and that stringent used and useful legislation will be enacted, the current market value [of LILCO stock] will probably decline and a tender offer [by LIPA] would be more likely to succeed at lower prices than without such legislation." Sawhill Report at 34 (Doc. 17, TAB 21). This certainly is some evidence that the articulated purpose purportedly underlying the Used and Useful Act was a mere pretext for an impermissible purpose offending specific prohibitions of the Constitution.

---

**27.** *Contra: Dandridge v. Williams*, 397 U.S. 471, 486–87, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970) ("[T]he [e]qual [p]rotection [c]lause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."); *Williamson v. Lee Optical*, 348 U.S. at 489, 75 S.Ct. at 465 ("[T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting the others." (citations omitted)).

In sum, the court finds that under all of the circumstances, an impartial legislator could not have logically concluded that the classification drawn by the Used and Useful Act "would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class." *Cleburne*, 473 U.S. at 452, 105 S.Ct. at 3261 (Stevens, J., concurring) (footnote omitted). The Used and Useful Act violates the mandates of equal protection.

 The court reaches a different conclusion in examining the LIPA Act. The purposes served by that Act—assuring that dependable and affordable sources of energy exist for residents and industry in LILCO's service area, and creating a publicly owned power authority to acquire LILCO either through negotiation, a tender offer or the exercise of the power of eminent domain if such acquisition would realize ratepayer savings for residents and industry on Long Island—are legitimate. *See supra* at 406–07. The LIPA Act obviously singles out LILCO, but in this case such a classification is closely related, and in fact necessary, to the achievement of the statute's aims. Consequently, defendants' motion for summary judgment on Count V of the Complaint is granted.

### F. *The Conspiracy Claim*

Finally, defendant Cuomo moves to dismiss Count IX of LILCO's Complaint, which alleges that Cuomo has conspired with other officials of the State of New York as well as officials of Suffolk County "to close the Shoreham plant" by preventing LILCO's compliance with federal regulations concerning emergency response planning, thereby violating 42 U.S.C. § 1983. Complaint ¶ 75. LILCO alleges that this conspiracy was furthered by Governor Cuomo's support of the Used and Useful Act and the LIPA Act, Complaint ¶ 33–40, his refusal to support or implement LILCO's proposed emergency evacuation plan for the area surrounding the Shoreham plant, Complaint ¶ 27–30, and the state's opposition to the licensing of Shoreham at NRC and ASLB hearings and in litigation. Complaint ¶ 31. LILCO also claims that defendant Cuomo conspired with state officials to depress the market value of LILCO's stock by "inducing" the New York State Energy Office to issue "clearly understated" load forecasts for LILCO's service area, thereby making the Shoreham plant seem unnecessary, by obstructing LILCO's attempts to obtain low cost tax-exempt financing, by instructing the DPC not to act on any proposed emergency response plan for Shoreham unless that plan was first approved by Suffolk County, and by opposing the renewal of a dredging permit by the United States Army Corps of Engineers. Complaint ¶ 46. It is alleged that defendant Cuomo also conspired with Suffolk County officials to hamper LILCO's efforts to comply with various federal regulations by encouraging radio station WALK to cease its service in the Shoreham Emergency Broadcast System, by urging the Red Cross as well as various local school districts to refuse to make their facilities available for the implementation of any emergency response plan devised by LILCO, and by refusing to renew the lease of a bus company which had cooperated with LILCO in emergency planning. Complaint ¶ 76.

 Certain claims are so easily made and can result in such severe disruption of governmental functions that the generally applicable "liberal pleading" rule of *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957), will not save them from dismissal under Fed.R.Civ.P. 12(b)(6) when such claims are not adequately supported with sufficient factual allegations. The Second Circuit has consistently recognized that claims of conspiracy to violate an individual's civil rights require more detailed fact pleading to withstand a motion to dismiss than is usually required. *See, e.g., Angola v. Civiletti*, 666 F.2d 1, 4 (2d Cir.1981); *see also Sommer v. Dixon*, 709 F.2d 173 (2d Cir.), *cert. denied*, 464 U.S. 857; 104 S.Ct. 177, 78 L.Ed.2d 158 (1983). To plead an adequate conspiracy claim, a plaintiff must allege that the defendant *agreed* to commit an illegal act with another person. *Crowe v. Lucas*, 595 F.2d 985, 993 (5th Cir.1979). In other words, allegations of conspiracy must be

supported by factual allegations suggesting a "meeting of the minds" among conspirators to "direct[ ] themselves toward an unconstitutional action...." *Smith v. Bacon,* 699 F.2d 434, 436 (8th Cir.1983). Conspiracies are seldom proven with direct evidence, and thus factual allegations of overt acts which give rise to a *reasonable* inference of the formation and furtherance of a conspiracy will suffice. *Rosaly v. Ignacio,* 593 F.2d 145, 152 (1st Cir.1979). Nonetheless, allegations that public officials "acted in concert or with a common goal" is not enough:

> There must be allegations that the [alleged conspirators] had directed themselves toward an unconstitutional action by virtue of a mutual understanding. Even were such allegations to be made, they must further be supported by some factual allegations suggesting such a "meeting of the minds."

*Tarkowski v. Robert Bartlett Realty Co.,* 644 F.2d 1204, 1206 (7th Cir.1980) (quoting *Sparkman v. McFarlin,* 601 F.2d 261, 268 (7th Cir.1979) (en banc) (Sprecher, J., concurring)).

■ Count IX of LILCO's complaint does not adequately allege a civil rights conspiracy and therefore must be dismissed. First, the only common thread linking the various specific governmental actions alleged is the participation of Governor Cuomo, and even then Cuomo's involvement with some of the governmental decisions LILCO finds offensive is stated in purely conclusory terms. No structure to the alleged conspiracy is discernable from LILCO's factual allegations; the Complaint describes a series of distinct actions involving different state agencies or officials from Suffolk County. Cuomo's alleged co-conspirators are never adequately identified, which necessarily makes it difficult to infer a "meeting of the minds" among these alleged conspirators. Finally, there is no basis upon which an inference can be made that any of the alleged conspirators acted with the intention to deprive LILCO of its constitutional rights. Although this court believes the Used and Useful Act violates the equal protection clause, the question is a very close one in which the weight of past equal protection cases may well support the state's position. The actions of the Governor and the legislature in passing a law later declared unconstitutional, particularly when the question is a close one, do not, without more, support a § 1983 conspiracy claim. None of the other overt acts alleged by LILCO appear to constitute "illegal acts" upon which a conspiracy claim can be based.

### CONCLUSION

Counts II, VI and IX of the Complaint are dismissed under Fed.R.Civ.P. 12(b)(6). To the extent that Count III states a claim for a "regulatory taking" in violation of the due process clause, that claim is also dismissed pursuant to Rule 12(b)(6). The motions by the various defendants for summary judgment on Counts IV, V, VII, VIII, and, to the extent it states a claim under the substantive due process doctrine, Count III, is granted. Plaintiff's motion for summary judgment on Count I is granted. The Used and Useful Act is declared violative of plaintiff's equal protection rights. The defendant Commissioners of the Public Service Commission are enjoined from taking any action to implement or enforce the Used and Useful Act.

It is so Ordered.